# EXHIBIT A

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: Aqueous Film-Forming Foams (AFFF) Products Liability Litigation | MDL No. 2873 |

**NOTICE OF POTENTIAL TAG-ALONG ACTION**

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, Defendant 3M Company writes to notify the Clerk of the Panel of the potential tag-along action listed in the attached Schedule. The docket sheet and complaint for the action is attached. *See* Exhibit 1 (*Loachapoka Water Authority, Inc. v. 3M Co.*, No. 3:26-cv-00376 (M.D. Ala.).

The complaint in this action seeks to recover for injuries from the alleged PFAS contamination of Loachapoka's water system. At least some of the PFAS allegedly contaminating Loachapoka's water system comes from water Plaintiff purchases from the City of Opelika—a water supply that is already at issue in the MDL. *See* Transfer Order at 1, ECF No. 3869 (Oct. 9, 2025) (transferring *City of Opelika* because its water supply "is already at issue in an action in the MDL," including at least one personal injury action); *see also* Water System Details for Loachapoka Water Authority, No. AL0000814, available at http://dww.adem.alabama.gov/ DWW/JSP/WaterSystemDetail.jsp?tinwsys_is_number=560&tinwsys_st_code=AL&wsnumber= AL0000814 (identifying water purchases from the Waterworks Board of the City of Opelika and identifying the "Primary Source" of water for the Loachapoka system as "SWP," or purchased surface water). Indeed, Loachapoka's water system itself is already at issue in the MDL in connection with the City of Opelika's case. *See* Exhibit 2 (Complaint in *Water Works Board of the City of Opelika v. 3M Co.*, No. No. 25-CV-12928 ¶ 30 (D.S.C.) (alleging that Opelika "wholesales

1

its treated water to other municipalities in Alabama, including . . . Loachapoka")).

The Panel has recognized that transfer is appropriate where an action concerns contamination of a water supply that is already at issue in the MDL, including cases in which the plaintiff's water provider is already at issue in the MDL. *See, e.g.*, Transfer Order at 1-2, ECF No. 1927 (June 5, 2023) (transferring *Broy*, noting that plaintiffs' claims "substantially overlap with the claims" of their water provider in the MDL "and necessarily will involve common questions of fact regarding, for instance, the nature of the alleged PFAS contamination and its source(s)"); *see also* Transfer Order at 3, ECF No. 3536 (June 2, 2025) (transferring *City of Savannah* after determining it was "sufficient" that it "involve[d] the same water supply already at issue in the MDL"); Transfer Order at 2, ECF No. 4225 (Apr. 2, 2026) (transferring *City of Clanton*, *Shelby County*, *Coosa Valley*, and *City of Irondale* because "the water supplies at issue in those actions are already at issue in actions pending in the MDL"). Therefore, this action involves issues and discovery that overlap cases pending in MDL No. 2873 related to alleged AFFF contamination of the Loachapoka water system.

Respectfully submitted,

**Defendant 3M Company**

DATED: May 13, 2026

/s/ *Daniel L. Ring*
Daniel L. Ring
Jenner & Block LLP
353 N. Clark St.
Chicago, Illinois 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
dring@jenner.com

*Counsel for Defendant 3M Company*

2

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: Aqueous Film-Forming Foams (AFFF) Products Liability Litigation | MDL No. 2873 |

## SCHEDULE OF ACTION

| | Plaintiff | Defendants | District | Civil Action No. | Judge |
|---|---|---|---|---|---|
| 1. | LOACHAPOKA WATER AUTHORITY, INC. AND CPR WELL, LLC | 3M COMPANY; BRIGGS & STRATTON CORPORATION; CNJ, INC.; CORTEVA, INC.; DAIKIN AMERICA, INC.; E.I. DUPONT DE NEMOURS AND COMPANY; DUPONT DE NEMOURS, INC.; EIDP, INC.; INTRAMICRON INC.; I-PEX USA MANUFACTURING INC.; K.C. SOL-TECH, INC.; LOTTE CHEMICAL ALABAMA CORP.; NASHVILLE WIRE PRODUCTS MANUFACTURING COMPANY, LLC.; REXNORD INDUSTRIES, LLC; CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; AND FICTITIOUS DEFENDANTS A–Z. | M.D. Ala. | 3:26-cv-00376 | R. Austin Huffaker, Jr. |

1

Respectfully submitted,

**Defendant 3M Company**

DATED: May 13, 2026

/s/ *Daniel L. Ring*
Daniel L. Ring
Jenner & Block LLP
353 N. Clark St.
Chicago, Illinois  60654
Tel: (312) 222-9350
Fax: (312) 527-0484
dring@jenner.com

*Counsel for Defendant 3M Company*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE: Aqueous Film-Forming Foams (AFFF)
Products Liability Litigation

MDL No. 2873

**PROOF OF SERVICE**

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that copies of 3M's Notice of Tag-Along, Schedule of Action, and accompanying exhibits were served electronically on all counsel of record in the above-captioned matter via ECF by May 13, 2026, and that copies were also served by First Class Mail and/or email on all parties in the following cases by May 13, 2026, as indicated below.

*Loachapoka Water Authority, Inc. v. 3M Co.*, **No. 3:26-cv-00376 (M.D. Ala)**

**By Mail and Email:**

Jeff Friedman
Jay Friedman
Ethan Wright
Madison Lakes
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
jfriedman@friedman-lawyers.com
jayfriedman@friedman-lawyers.com
ewright@friedman-lawyers.com
mlakes@friedman-lawyers.com

Keith Jackson
Riley & Jackson, P.C.
3530 Independence Drive
Birmingham, AL 35209
kj@rileyjacksonlaw.com

*Counsel for Plaintiff*

*By Mail:*

BRIGGS & STRATTON CORPORATION
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

*Defendant*

CNJ, INC.
c/o Kyu Yong Chung
265 Teague Ct
Auburn, AL 36832

*Defendant*

CORTEVA, INC.
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

DAIKIN AMERICA, INC.
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

DUPONT DE NEMOURS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

*Defendant*

E.I. DUPONT DE NEMOURS AND COMPANY
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

2

EIDP, INC.
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

INTRAMICRON INC.
c/o John S. Stein III
3595 Grandview Pkwy Ste 475
Birmingham, AL 35243

*Defendant*

I-PEX USA MANUFACTURING INC.
c/o Yugo Maeda
239 Technology Parkway
Auburn, AL 36830

*Defendant*

K.C. SOL-TECH, INC.
c/o Chang Hwan Jang
1500 Pumphrey Ave Ste D
Auburn, AL 36830

*Defendant*

LOTTE CHEMICAL ALABAMA CORP.
c/o Sang Hyuk Kim
765 W. Veterans Boulevard
Auburn, AL 36832

*Defendant*

NASHVILLE WIRE PRODUCTS MANUFACTURING COMPANY, LLC
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

REXNORD INDUSTRIES LLC
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

*Defendant*

THE CHEMOURS COMPANY
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

THE CHEMOURS COMPANY FC, LLC
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

*Defendant*

Respectfully submitted,

**Defendant 3M Company**

DATED: May 13, 2026

/s/ *Daniel L. Ring*

Daniel L. Ring
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
Tel: (312) 923-2625
Fax: (312) 527-0484
dring@jenner.com

*Counsel for Defendant 3M Company*

# EXHIBIT 1

Query    Reports    Utilities    Help    Log Out

# U.S. District Court
# Alabama Middle District (Opelika)
## CIVIL DOCKET FOR CASE #: 3:26-cv-00376-RAH-KFP

Loachapoka Water Authority, Inc. et al v. 3M Company et al
Assigned to: Chief District Judge R. Austin Huffaker, Jr
Referred to: Magistrate Judge Kelly F. Pate
Case in other court: Circuit Court of Lee County, AL, 43-cv-26-
900257.00
Cause: 28:1332 Diversity-Product Liability

Date Filed: 05/13/2026
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Loachapoka Water Authority, Inc.**                    represented by    **Brian Keith Jackson**
Riley & Jackson, PC
3530 Independence Drive
Birmingham, AL 35209
205-879-5000
Fax: 205-879-5901
Email: kj@rileyjacksonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ethan Robert Wright**
Friedman, Dazzio & Zulanas P.C.
3800 Corporate Woods Dr.
Birmingham, AL 35242
205-278-7083
Email: ewright@friedman-lawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Taylor Patterson**
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
205-278-7000
Fax: 205-278-7001
Email: lpatterson@friedman-lawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madison Maile Lakes**
Friedman, Dazzio & Zulanas PC
3800 Corporate Woods Drive
Birmingham, AL 35242
205-278-7058
Fax: 205-278-7001
Email: mlakes@friedman-lawyers.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew David Conn**
Friedman, Dazzio, Zulanas & Bowling, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
205-278-7000
Fax: 205-278-7001
Email: mconn@friedman-lawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CPR Well, LLC**                   represented by   **Brian Keith Jackson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ethan Robert Wright**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Taylor Patterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Madison Maile Lakes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew David Conn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**3M Company**                   represented by   **Harlan Irby Prater , IV**
Lightfoot Franklin & White LLC
400 20th Street North
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: hprater@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob Miller Salow**

Lightfoot Franklin & White, LLC
400 20th Street North
Birmingham, AL 35203
205-581-0726
Fax: 205-581-0799
Email: jsalow@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Christian King**
Lightfoot Franklin & White LLC
400 20th Street North; The Clark Building
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: cking@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Charles Johnson**
Lightfoot, Franklin & White LLC
400 20th Street North
Birmingham, AL 35203
205-581-1762
Fax: 205-581-0799
Email: wjohnson@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Harris Morrow**
Lightfoot Franklin & White LLC
400 20th Street North
Birmingham, AL 35203
205-581-0700
Email: wmorrow@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Larkin Radney , IV**
Lightfoot Franklin & White LLC
400 20th Street North; The Clark Building
Birmingham, AL 35203
205-581-0786
Fax: 205-581-0799
Email: lradney@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Briggs & Stratton Corporation**

**Defendant**

**CNJ, Inc.**

**Defendant**

**Corteva, Inc.**

**Defendant**

**Daikin America, Inc.**

**Defendant**

**DuPont De Nemours, Inc.**

**Defendant**

**E.I. DuPont de Nemours and Company**

**Defendant**

**EIDP, Inc.**

**Defendant**

**Intramicron Inc.**

**Defendant**

**I-Pex USA Manufacturing Inc.**

**Defendant**

**K.C. Sol-Tech, Inc.**

**Defendant**

**Lotte Chemical Alabama Corp.**

**Defendant**

**Nashville Wire Products Manufacturing Company, LLC**

**Defendant**

**Rexnord Industries LLC**

**Defendant**

**The Chemours Company**

**Defendant**

**The Chemours Company FC, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/13/2026 | 1 | NOTICE OF REMOVAL from Circuit Court of Lee County, Alabama, case number 43-CV-2026-900257. ( Filing fee $ 405 receipt number AALMDC-4067899) , filed by 3M Company. (Attachments: # 1 Exhibit A - Complaint, # 2 Exhibit B - State Court File, # 3 Exhibit C - Opelika Complaint, # 4 Civil Cover Sheet) (Radney, William) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | Corporate/Conflict Disclosure Statement by 3M Company. (Radney, William) (Entered: 05/13/2026) |

| 05/13/2026 | | COMPLAINT with JURY DEMAND against 3M Company, Briggs & Stratton Corporation, CNJ, Inc., Corteva, Inc., Daikin America, Inc., DuPont De Nemours, Inc., E.I. DuPont de Nemours and Company, EIDP, Inc., I-Pex USA Manufacturing Inc., Intramicron Inc., K.C. Sol-Tech, Inc., Lotte Chemical Alabama Corp., Nashville Wire Products Manufacturing Company, LLC, Rexnord Industries LLC, The Chemours Company, The Chemours Company FC, LLC, filed by CPR Well, LLC, Loachapoka Water Authority, Inc.. (No PDF attached to this entry - see doc 1 -1 at page 2 for PDF)(BES) (Entered: 05/13/2026) |
| 05/13/2026 | 3 | Case assigned to Chief District Judge R. Austin Huffaker, Jr. as Presiding Judge and Magistrate Judge Kelly F. Pate as Referral Judge. (BES) (Entered: 05/13/2026) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/13/2026 17:53:09 | | |
| **PACER Login:** | jbdocketing2023 | **Client Code:** | 72209-10043 |
| **Description:** | Docket Report | **Search Criteria:** | 3:26-cv-00376-RAH-KFP |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

ELECTRONICALLY FILED
4/9/2026 4:40 PM
43-CV-2026-900257.00
CIRCUIT COURT OF
LEE COUNTY, ALABAMA
MARY B. ROBERSON, CLERK

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

| | | |
|---|---|---|
| LOACHAPOKA WATER AUTHORITY, INC. AND CPR WELL, LLC; | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case Number: _____ |
| 3M COMPANY; BRIGGS & STRATTON CORPORATION; CNJ, INC.; CORTEVA, INC.; DAIKIN AMERICA, INC.; E.I. DUPONT DE NEMOURS AND COMPANY; DUPONT DE NEMOURS, INC.; EIDP, INC.; INTRAMICRON INC.; I-PEX USA MANUFACTURING INC.; K.C. SOL-TECH, INC.; LOTTE CHEMICAL ALABAMA CORP.; NASHVILLE WIRE PRODUCTS MANUFACTURING COMPANY, LLC.; REXNORD INDUSTRIES, LLC; CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; AND FICTITIOUS DEFENDANTS A–Z. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## **COMPLAINT**

Plaintiffs, Loachapoka Water Authority, Inc. and CPR Well, LLC, bring this action against the above-captioned Defendants and sets forth in detail the parties, facts, legal claims, and damages with particularity, as follows:

## STATEMENT OF THE CASE

1.      For decades, some of the world's largest chemical companies have manufactured PFAS[1], a family of synthetic chemicals valued for their ability to repel oil and water and resist staining. Because of these commercially valuable properties, a number of industries, including carpet, textiles, paper, metal plating and finishing, electronics, and more, have purchased and used PFAS in their manufacturing processes.

2.      The same chemical properties that make PFAS so valuable to these industries are also what makes PFAS dangerous. PFAS are known by the Environmental Protection Agency ("EPA") and industrial users to be persistent in the environment, bio-accumulative in humans and animals, and toxic (referred to in the chemical industry as "PBT").

3.      It is because of their environment persistence and bio-accumulative nature that PFAS are commonly referred to as "forever chemicals."

4.      Conventional drinking water systems are incapable of removing these "forever chemicals" from water. As a result, PFAS pass through conventional drinking water systems into the environment and eventually the bloodstreams of the general public.

5.      The EPA has found that PFAS are likely to cause an array of adverse health and environmental effects, including but not limited to, low birth weight in children, miscarriage, and cancer.  The current scientific consensus is that there is no safe level of PFAS in drinking water.

---

[1] As used herein, "PFAS" refers to all perfluorinated compounds, perfluorochemicals, polyfluorochemicals, perfluoroalkyl substances, polyfluoroalkyl substances, related chemicals that degrade to PFAS, and any precursors to PFAS, including but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), GenX, HFPO-DA, NEtFOSAA, NMeFOSAA, PFBS, PFDA, PFDoA, PFHpA, PFHxS, PFNA, PFTrDA, PFTA, PFUnA, 11Cl0PF3OUdS, 9Cl-PF3ONS, ADONA, PFPeS, PFHpS, 4:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 6:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 8:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), PFBA, PFPeA, PFMBA, PFMPA, PFEESA, PTFE, and NFDHA.

6. The Defendants in this case have all caused or contributed to these toxic chemicals invading the Plaintiffs' drinking water.

7. The PFAS Manufacturers created and sold these chemicals to industries throughout the State of Alabama, with full knowledge of its products' pernicious effects and likelihood of causing pollution to Plaintiffs' water supply. Upon information and belief, the PFAS Manufacturers continue to produce and sell PFAS products to this day. Rather than taking efforts to warn or prevent this pollution, The PFAS Manufacturers actively concealed and withheld information—and continues to conceal and withhold information—from regulatory agencies, customers, and the general public, all the while causing these chemicals to continuously damage Plaintiffs.

8. Upon information and belief, the PFAS User Defendants purchased and used PFAS and products containing or degrading into PFAS in their industrial processes. These Defendants have continuously caused and permitted PFAS-contaminated waste to be discharged into the environment and surrounding areas from where Plaintiffs collect its drinking water. These Defendants do not have authorization to discharge PFAS, and they knew or should have known that their use and discharge of PFAS would pollute Plaintiffs' water and cause Plaintiffs injury. The PFAS Users' discharge of PFAS into the environment—and ultimately Plaintiffs' drinking water—was the result of the ordinary and expected usage of those products in their manufacturing processes. The end result, pollution of Plaintiffs' drinking water, was known or should have been reasonably anticipated by the PFAS Manufacturer Defendants.

9. All of these Defendants have known—some for decades—that PFAS should not be discharged via wastewater, stormwater, groundwater, land application, or leachate to wastewater treatment plants or the environment.

- 3 -

10.     Nevertheless, the Defendants have jointly and continuously caused these "forever chemicals" to enter the Plaintiffs' drinking water.

11.     Now, because of the PFAS pollution that Defendants have caused, Plaintiffs must find a way to remove these harmful chemicals from their water in order to meet obligations as public water providers, comply with federal regulations and guidelines, and most importantly, protect human health and the environment.

12.     Plaintiffs, like most public water systems, do not have the treatment technology necessary to remove PFAS from raw water. Therefore, Plaintiffs will be required to upgrade to costly and sophisticated new treatment technologies in order to remove Defendants' PFAS from its drinking water.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court pursuant to Ala. Code § 12-11-30, because the Defendants' wrongful conduct has jointly and severally caused damage to the Plaintiffs in Lee County, Alabama, exceeding $20,000.00 as alleged herein and Plaintiffs will continue to suffer damages in Lee County in the future.  Plaintiffs' real property, which is the subject of this action, is situated in Lee County, including the wells and treatment facility.

14.     The wrongful acts perpetrated by the Defendants which form the basis of this Complaint, including the ongoing and continuing trespass and the creation of an ongoing and continuing nuisance, occurred and are still occurring in Lee County and have injured and will continue to injure the Plaintiffs in Lee County within the applicable statutes of limitations. The Defendants, jointly and severally, have caused ongoing and continuing damages to Plaintiffs within the applicable statutes of limitations. Plaintiffs' cause of action accrued within the applicable statute of limitations.

- 4 -

15. Venue is proper in this Court pursuant to Ala. Code § 6-3-7, because (i) a substantial part of the events giving rise to this claim occurred in Lee County, (ii) a substantial part of the real property that is the subject of the action is situated in Lee County, (iii) Defendants CNJ, Inc., K.C. Sol-Tech, Inc., and Lotte Chemical Alabama Corp.'s principal offices in the State of Alabama are in Lee County, and (iv) the Plaintiffs reside in Lee County. Further, all Defendants are doing business by agent in Lee County.

## DISCLAIMER

16. This lawsuit is brought under the laws of the State of Alabama. Plaintiffs assert no federal causes of action, invoke no federal statutes, and seek no relief that is based on any federal statute or laws. Any federal claims are expressly disclaimed.

17. Complete diversity does not exist between Plaintiff and all Defendants. This case arises out of the manufacture, supply, use, land application, and disposal of PFAS, and Plaintiffs make no claim that the manufacture or use of "MilSpec AFFF" in any way caused or contributed to its damages or the claims asserted in this lawsuit.

18. Plaintiffs expressly disclaim any cause of action or damages arising from or associated with "MilSpec AFFF" manufacture, sale, use or disposal by the named Defendants, or by any unnamed defendant or entities, including any legal or factual claim based on alleged "MilSpec AFFF" as well as any potential claims arguably arising from any federal enclaves.

19. Based upon Plaintiffs' investigation into the facts, and upon information and belief, the PFAS currently contaminating Plaintiffs' source and drinking water is from industrial sources and/or non-military firefighting foams and is not the result of any AFFF used by the military.

## NO CLASS ACTION PARTICIPATION

20.     3M (and possibly some of the fictitious Defendants) has been sued in other cases involving allegations of PFAS pollution to public water systems. In 2023, 3M and DuPont settled nationwide, multi-district, class-action claims related to the contamination of public water supplies with PFAS for approximately $10 billion and $1.185 billion, respectively. S*ee In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) ("*AFFF Litigation*").

21.     Prospective class members in the *AFFF Litigation* had the option of "opting out" of the 3M and DuPont settlements in order to pursue individual lawsuits against 3M and DuPont. Plaintiffs validly and timely exercised its right to "opt out" of the *AFFF Litigation* Class Action Settlements with 3M and DuPont to pursue its claims in this lawsuit. Plaintiffs have received confirmation from the Notice Administrator overseeing these settlements that its opt-out was in fact "compliant."

22.     In 2024, Judge Richard Gergel, the United States District Court Judge for the District of South Carolina overseeing the *AFFF Litigation*, entered orders of final approval on the DuPont and 3M settlements, respectively. At no time has 3M, DuPont, or any other party raised objections to Plaintiffs' decision to opt-out from the settlements.

## PARTIES

### I.     Plaintiffs

23.     Plaintiff Loachapoka Water Authority, Inc. (hereinafter "Loachapoka"), located in Lee County, is a domestic non-profit corporation organized under the laws of the State of Alabama, which operates various departments to enhance the health, safety, and general well-being of its

- 6 -

citizens. The Loachapoka Water Authority, Inc., among other responsibilities, provides drinking water to Loachapoka and surrounding areas.

24. Plaintiff CPR Well, LLC ("CPR") is a domestic limited liability company organized under the laws of the State of Alabama.

25. Plaintiffs Loachapoka and CPR are hereinafter collectively referred to as "Plaintiffs."

26. Plaintiffs own, lease, and/or operate a groundwater well, the Reynolds Well, that draws water from the metasedimentary and metavolcanic aquifer. Plaintiffs own and/or lease the property surrounding the well and enjoy rights to the water from this well, as well as property rights over the water which it draws, treats, and sells to customers.

27. Loachapoka's water treatment facilities are incapable of removing or treating Defendants' PFAS to levels deemed safe by the federal government.

28. Plaintiffs have been and continue to be damaged due to the negligent, willful, and wanton conduct of the Defendants, as well as a result of the continuous nuisance and trespass caused by Defendants' past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS.

29. As a direct and proximate result of Defendants' past and continuing conduct, Plaintiffs have suffered, and will continue to suffer, substantial economic and consequential damage, including but not limited to: expenses associated with PFAS contamination in Plaintiffs' raw water and drinking water; expenses associated installing temporary emergency filtration and pumping systems; pilot program costs associated with permanent filtration systems capable of removing Defendants' PFAS from Plaintiffs' drinking water; costs associated with the purchase, installation, and operation of permanent filtration systems capable of removing Defendants' PFAS

- 7 -

from Plaintiffs' drinking water; costs associated with remediating Plaintiffs' existing treatment and pumping facilities; damage to goodwill and reputation; and potential and/or actual lost revenue and sales. In addition, Plaintiffs seek engineering, operating, and maintenance costs.

30.     Plaintiffs seek compensatory and punitive damages to the fullest extent allowed by Alabama law. Plaintiffs seek compensatory damages for filtration equipment and permanent facilities necessary to operate filtering systems sufficient to remove all PFAS from drinking water. Plaintiffs also seek abatement of the continuous nuisance and trespass caused by Defendants, as well as equitable and injunctive relief compelling the Defendants to remediate their contamination and prevent additional releases of PFAS and other toxic chemicals into Plaintiffs' water supply.

## II.     Defendants

### A.  PFAS Manufacturer Defendants

31.     Defendant 3M Company ("3M") is a foreign corporation organized under the law of the State of Delaware and is authorized to transact business in the State of Alabama. 3M has knowingly manufactured, sold, used and/or transported PFAS or products that contain and/or degrade into PFAS in the State of Alabama, which ultimately end up in Plaintiffs' source water supply. PFAS manufactured, sold, used, and/or transported by 3M is currently contaminating Plaintiffs' drinking water. Despite knowing for decades about the pernicious effects of its PFAS products, 3M has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. 3M knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Plaintiffs' source water. Through its manufacture, sale, supply, distribution, and use of

PFAS and related products, 3M is causing and contributing to a nuisance, trespass, and injury to Plaintiffs in Lee County.

32.     Defendant Daikin America, Inc. ("Daikin") is a foreign corporation organized under the laws of the State of Delaware and is authorized to transact business in the State of Alabama. Daikin operates a manufacturing facility in Decatur, Alabama, where it manufactures and/or uses perfluorochemicals and products. Upon information and belief, Daikin is a wholly owned subsidiary of Daikin Industries, Ltd. Daikin has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products which degrade into PFAS in the State of Alabama, which ultimately end up in the Plaintiffs' source water supply. PFAS manufactured, sold, used, and/or transported by Daikin is currently contaminating Plaintiffs' source water. Despite knowing for decades the pernicious effects of its PFAS products, Daikin has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. Daikin knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Plaintiffs' source water. Through its manufacture, sale, supply, distribution, and use of PFAS and related products, Daikin is causing and contributing to a nuisance, trespass, and injury to Plaintiffs in Lee County.

33.     Defendant E.I. du Pont de Nemours and Company is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of Alabama.

34.     DuPont de Nemours, Inc. is a foreign corporation organized under the laws of the State of Delaware and does business in the State of Alabama.

- 9 -

Case 3:26-md-03976-SDD Document 03-34 Filed 05/13/26 Page 16 of 138

35. Corteva, Inc. is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of Alabama.

36. EIDP, Inc. is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of Alabama.

37. E.I. du Pont de Nemours and Company, Dupont de Nemours, Inc., Corteva, Inc. and EIDP, Inc. are hereinafter collectively referred to as "DuPont." DuPont has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS in the State of Alabama, which ultimately end up in the Plaintiffs' source water supply. PFAS manufactured, sold, used, and/or transported by DuPont is currently contaminating Plaintiffs' water supply. Despite knowing for decades the pernicious effects of its PFAS products, DuPont has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. DuPont knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Plaintiffs' water supply. Through its manufacture, sale, supply, distribution, and use of PFAS and related products, DuPont is causing and contributing to a nuisance, trespass, and injury to Plaintiffs in Lee County.

38. Defendant The Chemours Company ("Chemours") is a foreign corporation organized under the laws of the State of Delaware and authorized to transact business in the State of Alabama.

39. The Chemours Company FC, LLC is a foreign limited liability company organized under the laws of the State of Delaware and authorized to transact business in the State of Alabama.

40. The Chemours Company and The Chemours Company FC, LLC are hereinafter collectively referred to as "Chemours." Chemours has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS into the State of Alabama. PFAS manufactured, sold, used, and/or transported by Chemours is currently contaminating Plaintiffs' water supply. Despite knowing the pernicious effects of its PFAS products, Chemours has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. Chemours knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Plaintiffs' water supply. Through its manufacture, sale, supply, distribution, and use of PFAS and related products, Chemours is causing and contributing to a nuisance, trespass, and injury to Plaintiffs in Lee County.

41. 3M, DuPont, Chemours, and Daikin collectively referred to herein as the "PFAS Manufacturers."

42. The PFAS Manufacturers have operated in the past, and/or are currently operating, manufacturing facilities related to PFAS and products that contain or degrade into PFAS. The PFAS Manufacturers use PFAS as part of their manufacturing processes or otherwise supply PFAS or products that contain or degrade into PFAS to various industries.

43. PFAS, and products that contain or degrade into PFAS, are manufactured and sold by the PFAS Manufacturers to the PFAS Users. These products are subsequently discharged both directly and indirectly into the environment and surrounding areas from where Plaintiffs collect their drinking water in Lee County, Alabama. Defendants' discharges and/or land application of

- 11 -

PFAS and/or PFAS-containing biosolids have infiltrated the groundwater where Plaintiffs obtain their drinking water. As a direct result, Plaintiffs' water supply has been contaminated.

44. The PFAS Manufacturers have known for years that PFAS are harmful to human health and resistant to degradation or filtration by conventional treatment systems. The PFAS Manufacturers had full knowledge that the PFAS they manufactured and supplied to industrial users would invade the environment, groundwater and surrounding areas from where Plaintiffs collect their drinking water via wastewater effluent and other discharges and ultimately contaminate the Plaintiffs' drinking water supply.

45. The PFAS Manufacturers have caused and contributed, and are still causing and contributing to, a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products that contain or degrade into PFAS.

**B. PFAS User Defendants**

46. Defendant Briggs & Stratton Corporation ("Briggs") is a foreign corporation organized under the laws of the State of Wisconsin and authorized to transact business in the State of Alabama. Briggs operates an engine and generator manufacturing facility located at 150 Technology Parkway, Auburn, Alabama 36830. Upon information and belief, Briggs has been operating at this location since 1995 and its manufacturing activities include and/or previously included ferrous and non-ferrous machining, painting, stamping, coating, and engine assembly. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, Briggs is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

47. Defendant CNJ, Inc. ("CNJ") is a domestic corporation organized under the laws of the State of Alabama and authorized to transact business in the State of Alabama. CNJ operates an automotive discs brakes manufacturing facility located at 265 Teague Ct, Auburn, Alabama 36832. According to CNJ's website, CNJ specializes in metal machining and coating. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, CNJ is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

48. Defendant IntraMicron Inc. ("IntraMicron") is a foreign corporation organized under the laws of the State of Delaware and is authorized to transact business in the State of Alabama. IntraMicron owns and/or operates a chemical processing and material manufacturing facility located at 368 Industry Dr, Auburn, Alabama 36832. IntraMicron's manufacturing operations include metal finishing. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, IntraMicron is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

49. Defendant I-PEX USA Manufacturing Inc. ("I-PEX"), formerly known as Touchstone Precision, Inc., is a domestic corporation organized and existing under the laws of the State of Alabama. I-PEX owns and/or operates an automotive plastics manufacturing facility located at 239 Technology Pkwy, Auburn, Alabama 36830. According to the I-PEX website, I-PEX specializes in "automated injection and insert molding, connector assembly, and metal stamping. Our current solution focuses on precision plastic components for connectors, electronic and automotive applications." Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, I-PEX is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

50.     Defendant K.C. Sol-Tech, Inc. ("K.C.") is a domestic corporation organized and existing under the laws of the State of Alabama. K.C. owns and/or operates a tool and die machining and fabrication facility located at 1127 W. Veterans Blvd, Auburn, AL 36832. K.C.'s business operations include metal fabrication and powder coating. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, K.C. is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

51.     Defendant Lotte Chemical Alabama Corp. ("Lotte") is a domestic corporation organized and existing under the laws of the State of Alabama. Lotte was previously known as "HPM Alabama Corporation" ("HPM"). HONAM Petrochemical Corporation was formed under the name "HPM Alabama Corporation" ("HPM"). HONAM Petrochemical Corporation is part of the Lotte Group. Lotte owns and/or operates an automotive plastics and chemical manufacturing facility located at 765 W. Veterans Blvd, Auburn, Alabama 36832. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, Lotte is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

52.     Defendant Nashville Wire Products Manufacturing Company, LLC ("Nashville Wire") is a foreign limited liability company organized and existing under the laws of the State of Tennessee and is authorized to transact business in the State of Alabama. Nashville Wire owns and/or operates a wire-based products and metal components manufacturing facility located at 1955 McMillan St, Auburn, Alabama 36832. Upon information and belief, this location was formerly owned and/or operated by Sommer Metalcraft Corporation before it was owned and/or operated by Matrix Wire, Inc. This location previously operated under the name "Nashville Wire Products Manufacturing Company" and then "Nashville Wire Products Manufacturing Company, Inc." before converting the name to "Nashville Wire Products Manufacturing Company, LLC."

- 14 -

DOCUMENT 2

Since the 1980s, the operations at this location have included metal finishing, cleaning, coating, and fabrication. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, Nashville Wire is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

53.     Defendant Rexnord Industries, LLC ("Rexnord") is a foreign limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Milwaukee, Wisconsin. Rexnord is authorized to transact business in the State of Alabama. Rexnord owns and/or operates a steel mechanical couplings manufacturing facility located at 1600 Pumphrey Ave, Auburn, Alabama 36832. Upon information and belief, this location was formerly owned and/or operated by Falk Corporation as a metal fabrication and manufacturing facility since 1975. Rexnord's manufacturing operations include metal finishing. Upon information and belief, through its manufacture and use of products containing and/or degrading into PFAS, Rexnord is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

54.     PFAS was commonly used in the fabrication industry for heat, water, and chemical resistance, especially in metal plating operations for mist suppression, decorative chrome plating, electroplating, corrosion inhibitor, the reduction of mechanical wear, abrasion resistance, a leveling agent, as wetting agents, and more. For example, PFAS was commonly used to suppress harmful fumes that were emitted during electroplating processes called hexavalent chrome-plating. In 2015, the United States Environmental Protection Agency banned the use of PFOS in chrome plating fume suppressants.

55.     Industrial wastewater discharged in the past and/or currently from the PFAS Users' manufacturing facilities contains PFAS, which have invaded the environment and groundwater

source(s) where Plaintiffs collect their drinking water and ultimately contaminated Plaintiffs' drinking water supply. In addition to discharging PFAS in industrial wastewater, the PFAS Users have also discharged PFAS by way of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and/or groundwater. Further, the PFAS Users have released PFAS into the air.

56.     The PFAS Users knew or should have known that PFAS are harmful to human health and the environment, and that their PFAS-contaminated waste streams would invade and persist in the environment, groundwater and Plaintiff's drinking water supply.

57.     The PFAS Users have caused and contributed, and are still causing and contributing, to a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products containing or degrading into PFAS.

### C.  Fictitious Defendants

58.     Fictitious Defendants A-E, whether singular or plural, entity or entities, are those defendants who have operated in the past, and/or are currently operating, manufacturing facilities related to the production of products and/or chemicals that contain or degrade into certain PFAS chemicals, including PFOS and PFOA, and that have sold PFAS and/or products that contain or degrade into PFAS, to the PFAS Users and Fictitious Defendants F-P, which are subsequently discharged both directly and indirectly into the metasedimentary and metavolcanic aquifer, and other tributaries and watersheds in the surrounding areas of Plaintiffs' water supply, as a direct result, contaminate the Plaintiffs' water, similar to the PFAS Manufacturer in Section II.A.

59.     Fictitious Defendants F-P, whether singular or plural, entity or entities, are those defendants who have owned and/or operated in the past, and/or currently own and/or operate,

manufacturing facilities or related properties which have purchased, used and/or utilized PFAS in their manufacturing processes and discharged wastewater containing PFAS into the environment and/or surface water source(s) where Plaintiffs collect their drinking water, whether directly or indirectly, similar to the PFAS Users in Section II.B. Fictitious Defendants F-P also include those defendants who have discharged and/or continue to discharge PFAS from manufacturing facilities or related properties by way of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and groundwater and contaminate Plaintiffs' drinking water supply.

60.     Fictitious Defendant Q-U, whether singular or plural, is the individual or entity other than those named above, whose negligence, nuisance, trespass, wantonness, failure to warn, or other wrongful conduct contributed to cause the occurrence that made the basis of this suit.

61.     Fictitious Defendants V-Z, whether singular or plural, is the person, firm, or entity who is the successor-in-interest, predecessor, or correct legal designation of any of the entities described above.

62.     Fictitious Defendants knew or should have known that PFAS are harmful to human health and the environment, and that their PFAS-contaminated waste streams would invade and persist in the environment, groundwater and Plaintiffs' drinking water supply. Fictitious Defendants have caused and contributed, and are still causing and contributing, to a continuous nuisance and trespass through its discharge, land application, and/or release of PFAS and products containing or degrading into PFAS.

63.     Plaintiffs aver that the identities of Fictitious Defendants A-Z are otherwise unknown to Plaintiffs at this time, or if their names are known to Plaintiffs, their identities as proper party defendants are not known to Plaintiffs at this time and/or their actions/omissions as

- 17 -

liable parties are not known to Plaintiffs at this time, and their true names will be substituted by amendment when ascertained.

## FACTUAL ALLEGATIONS

### I.   "Long-Chain" PFAS are a Threat to Human Health and the Environment.

64.   PFAS are man-made, synthetic chemicals used to impart oil-, water-, and stain-resistance to various products, including carpet, paper, and textiles. The same chemical properties that provide enhanced soil-resistant attributes also make PFAS resistant to degradation and persistent in the environment.

65.   PFAS are known to the EPA and the Defendants as "forever chemicals" because these man-made chemicals persist in the environment for extremely long periods and do not degrade like other chemicals. PFAS accumulates in the human body through the process of bioaccumulation. In fish and mammals, PFAS accumulate, build, and increase through biomagnification. PFAS also migrate through surface water and groundwater, allowing PFAS compounds to travel long distances while causing extensive contamination.

66.   Since PFAS do not degrade naturally and are synthetic "forever chemicals," PFAS released into the environment ten (10), twenty (20), or thirty (30) years ago will remain present and will continue causing pollution that is a threat to public health, unless removed by very specific filtration methods.

67.   Although there are thousands of chemical substances that fall under the PFAS umbrella, the two most notorious PFAS chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"). These two (2) chemicals are also referred to as C-8s and/or long-chain fluorochemicals.

68. PFOS and PFOA are considered "long-chain" PFAS (sometimes referred to as "C-8" chemistries), because they contain eight (8) fluorinated carbon atoms. 3M has known for decades that, because of the strong carbon-fluorine bond, PFOS and PFOA do not degrade naturally in the environment. Upon information and belief, this information was later made known to the PFAS User Defendants.

69. According to the EPA, 3M was the sole manufacturer of PFOS in the United States and the principal manufacturer of PFOS worldwide. Upon information and belief, 3M supplied PFOS and/or products containing or degrading into PFOS to the PFAS Users for use in their manufacturing processes.

70. DuPont, Daikin, and 3M all manufactured PFOA and/or products containing or degrading into PFOA. Upon information and belief, DuPont, Daikin, and 3M supplied PFOA and/or products containing or degrading into PFOA to the PFAS Users for use in their manufacturing processes.

71. 3M and DuPont began studying the toxicity of PFOS and PFOA as early as the 1950s and 1960s.

72. By the 1970s, 3M and DuPont were aware that their products persisted indefinitely in the environment. 3M also learned during this time that PFOS was present in the blood of its employees and the general public.

73. In the 1970s and 1980s, 3M began conducting animal studies to determine the possible carcinogenicity of PFAS chemicals. One such study, an investigation into the effects of PFOS on rhesus monkeys, had to be aborted prior to the conclusion of the study "[b]ecause of unexpected early mortalities in all monkeys at all levels" of PFOS dosage. In 1978, a 3M

interoffice correspondence concluded that "[r]ecent animal studies have shown that FC-95 [PFOS] is more toxic than was previously believed."

74. By the 1980s and 1990s, 3M and DuPont were fully aware that PFOS and PFOA were toxic and persistent in the environment and that conventional treatment methods were ineffective at removing these pollutants. Nevertheless, the two companies actively hid their findings from regulators and the general public. In 1988, a 3M internal memo raised concerns that 3M had "perpetuate[d] the myth that these fluorochemical surfactants are biodegradable."

75. In 1997, 3M prepared a Material Safety Data Sheet (MSDS) for a product containing PFAS. The MSDS contained the following warning:

> CANCER:
> WARNING: Contains a chemical which can cause cancer. (3825-26-1) (1983 and 1993 studies conducted jointly by 3M and DuPont).

76. This warning was removed from subsequent MSDSs.

77. In the late 1990s, 3M began a comprehensive, multi-city investigation into the extent of its PFAS pollution. It found an unending cycle of pollution in which PFAS Manufacturers, PFAS Users, and Landfills all play a role in continuing the invasion of PFAS in drinking water.

78. 3M also concluded during this investigation that reverse osmosis is the only treatment method capable of removing all PFAS.

79. In 1999, Richard Purdy, one of 3M's lead scientists on the multi-city study, resigned from his position due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors."

80.     Mr. Purdy's letter, which was also sent to a representative of the EPA, further stated that PFOS "is the most insidious pollutant since PCB" and "more stable than many rocks."

81.     Following Mr. Purdy's letter, the EPA began an investigation into PFOS after receiving data that "PFOS was persistent, unexpectedly toxic, and bioaccumulative (PBT)." Federal Register/Vol. 68, 2003.

82.     During its subsequent investigation of 3M, the EPA disclosed that "following negotiations with EPA, 3M . . . announced that it will voluntarily phase out perfluorooctanyl sulfonate ("PFOS") chemistry." The EPA determined that PFOS was toxic and accumulated to a high degree in humans and animals. The EPA's preliminary risk assessment found unacceptable margins of exposure for workers and possibly the general population exposed to PFOS.

83.     The EPA concluded that "PFOS represents an unacceptable technology that should be eliminated to protect human health and the environment from potentially severe long-term consequences." Shortly thereafter, the EPA expanded its investigation to perfluorooctanoic acid (PFOA), stating "EPA was concerned in part because 3M had also found PFOA in human blood during the studies on PFOS."

84.     After 3M announced that it was withdrawing PFOS and PFOA from the market in 2000, DuPont and Daikin continued to manufacture and/or use PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

85.     Upon information and belief, the PFAS Users continued to purchase, use, and discharge PFOA and products containing or degrading into PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

86.     By 2006, the majority of an EPA Science Advisory Board expert committee had recommended that PFOA be considered "likely to be carcinogenic to humans." Similarly, an independent C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure, based on epidemiological and other data in the Mid-Ohio Valley.

87.     Despite the growing awareness that PFOA was just as persistent, bio-accumulative, and toxic as PFOS, DuPont and Daikin continued to manufacture and supply PFOA and products containing and/or degrading into PFOA until at least 2015.

88.     All of the Defendants have known that PFOS and PFOA are toxic, persistent, and bioaccumulative.

89.     All of the Defendants have known or should have known that the ordinary usage of products containing or degrading to PFAS in manufacturing processes will cause PFAS to discharge into the environment via industrial wastewater effluent, stormwater runoff or other discharges.

90.     All of the Defendants have known that permits and/or state and local laws and regulations prevent the discharge of PFAS into conventional wastewater treatment plants incapable of removing or treating PFAS.

91.     All of the Defendants have known that the PFAS products used by PFAS Users would ultimately enter the Plaintiffs' drinking water supply, and that conventional drinking water treatment systems are incapable of removing PFOS and PFOA from water supplies. Upon information and belief, this information later became known to the PFAS User Defendants as well (albeit years, if not decades, after the PFAS Manufacturer Defendants).

- 22 -

92.     Nevertheless, the Defendants in this case supplied, used, purchased, and/or accepted PFOS and PFOA, and/or products containing or degrading into PFOS and PFOA, without using adequate care to prevent the contamination of Plaintiffs' water supply.

93.     PFOS and PFOA manufactured, used, and discharged by the Defendants are still present at dangerously high levels in Plaintiffs' drinking water supply. Upon information and belief, these Defendants are still discharging wastewater, leachate, stormwater, and other types of discharges containing PFOS and PFOA into the environment contaminating the Plaintiffs' groundwater supply to this day.

## II.     "Short-Chain" PFAS

94.     After 3M phased out "long-chain" PFAS, it began selling "short-chain" PFAS compounds (sometimes referred to as "C-6" and "C-4" chemistries), and/or products that contained or degraded into "short-chain" PFAS, to the PFAS Users.  DuPont and Daikin eventually converted to "short-chain" PFAS as well.

95.     In or around 2015, DuPont spun off its Performance Chemicals business line into a new company, Chemours, which continued selling and marketing "short-chain" PFAS, including but not limited to HFPO-DA (or "Gen-X").

96.     The "short-chain" PFAS compounds sold and/or used by the Chemical Manufacturers included and/or degraded into PFOS, PFOA, PFBS, PFBA, PFHxA, PFHxS, PFNA, PFPeA, Gen-X, and more.

97.     Defendants knew or should have known that that these "short-chain" PFAS compounds were not only just as toxic, persistent, and bioaccumulative as their "long-chain" predecessors, but also still had PFOS and/or PFOA present in the products themselves. Defendants also knew or should have known that conventional drinking water treatment systems are incapable

- 23 -

of removing "short-chain" PFAS from water supplies. Nevertheless, Defendants supplied, used, purchased, and/or accepted "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiffs' water supply.

98.     Some short-chain PFAS actually contain PFOS and/or PFOA as a byproduct and/or an impurity.  So, while advertising their short-chain PFAS as an alternative to long-chain C-8s (PFOS and PFOA), the Chemical Manufacturers were continuing to manufacture and sell their most toxic chemicals to customers and, in turn, putting these chemicals into waste streams and the environment.

99.     Upon information and belief, Defendants continue to supply, use, purchase, accept, and/or discharge "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiffs' water supply, to this day.

100.     PFAS Manufacturing Defendants knew of the presence of PFOS and/or PFOA in its short chain products, but actively hid this from the public and regulators, and continue to do so.

## III.     PFAS Regulations

101.     On April 10, 2024, EPA announced a National Primary Drinking Water Regulation ("NPDWR") for six PFAS in drinking water: PFOA, PFOS, PFBS, PFNA, PFHxS, and Gen-X. The EPA's NPDWR set legally enforceable Maximum Contaminant Levels ("MCLs") for these six PFAS, which became effective in June 2024.

102.     In 2025, the EPA and its newly-appointed Administrator, Lee Zeldin, undertook a second-round review of the NPDWR and reaffirmed its intention to regulate PFOA and PFOS in

drinking water. In doing so, Administrator Zeldin and the EPA made clear the EPA's policy to hold polluters accountable in reaching compliance with PFOS and PFOA drinking water limits.

103.    Under the NPDWR, public water systems, like Loachapoka, are required to monitor and report concentrations of PFAS in its drinking water. The NPDWR also requires public water systems to provide drinking water with no more than 4 ppt PFOS or 4 ppt PFOA.

104.    In announcing these MCLs, EPA stated that it "expects that over many years the final rule will prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses." Pursuant to the NPDWR, EPA also established "health-based" Maximum Contaminant Level Goals ("MCLGs") for PFOA and PFOS at zero ppt.

105.    The EPA explained the decision-making process behind the MCLGs: "Following a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

106.    Finally, in 2024, the EPA formally designated PFOA and PFOS as "Hazardous Substances" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERLCA"). According to the EPA, the designation of PFOA and PFOS as "Hazardous Substances" under CERCLA "is designed to ensure that those responsible for contamination pay to clean it up."

**IV.    Fate and Transport**

107.    All of the Defendants have caused or contributed to the PFAS in the metasedimentary and metavolcanic aquifer, Reynolds Well, and/or Plaintiffs' water supply.

108. Upon information and belief, the following Defendants have manufactured, formulated, sold, supplied and/or transported PFAS and/or PFAS-containing products to PFAS Users that were ultimately discharged, directly or indirectly, into Plaintiffs' water supply: 3M, Daikin, DuPont, and/or Fictitious Defendants A-E.

109. Upon information and belief, the following Defendants have discharged, whether through an NPDES permit or otherwise, PFAS and/or stormwater containing PFAS into the metasedimentary and metavolcanic aquifer, Reynolds Well, Parkerson Mill Creek, Choctafaula Creek, surrounding waterways, and/or Plaintiff's water supply: Briggs, Nasvhile Wire, Rexnord, and/or Fictitious Defendants F-P.

110. Upon information and belief, the following Defendants have discharged PFAS and/or wastewater containing PFAS to the H.C. Morgan Pollution Control Facility (also referred to as Veolia Water North America – South, LLC), which passed through the wastewater treatment system and into the metasedimentary and metavolcanic aquifer, and/or Plaintiff's water supply, whether via direct discharge, indirect discharge, PFAS-contaminated industrial wastewater discharges, air discharges, and/or land application: Briggs, IntraMicron, Nashville Wire, Rexnord, and/or Fictitious Defendants F-P.

111. Upon information and belief, the following Defendants have discharged PFAS and/or wastewater containing PFAS into the environment surrounding the City of Auburn, which ultimately ended up in the metasedimentary and metavolcanic aquifer, Reynolds Well, Parkerson Mill Creek, Choctafaula Creek, surrounding waterways, and/or Plaintiff's water supply: Fictitious Defendants F-Z.

## V.     PFAS POLLUTION IN AND AROUND PLAINTIFFS' WATER SUPPLY

112.     Plaintiffs currently obtain water from one groundwater well, the Reynolds Well, producing from the metasedimentary and metavolcanic aquifer. The coordinates of the Reynolds Well are 32°31'12.0" W85°31'45.8" with the nearest physical address being 5475 US-29, Auburn, AL 36830.

113.     Testing has detected PFAS contamination in the Reynolds Well above the MCLs.

114.     Plaintiffs have sampled Reynolds Well on multiple occasions and have found levels of PFOA as high as 19.4 ppt.

115.     Loachapoka's existing water treatment infrastructure is incapable of removing PFOA and PFOS from the water supply.

116.     PFAS pollution caused by the Defendants has jeopardized the safety of Plaintiffs' groundwater source(s) as an ongoing source of drinking water for the residents of Loachapoka.

117.     Plaintiff expressly states that it suffered no legal injury prior to the finalization of the EPA's binding regulations of PFOS and PFOA in drinking water in 2024.

118.     The PFAS Users and/or Fictitious Defendants F-P operate manufacturing facilities that in the past and/or currently discharge PFAS into the environment and surrounding areas, contaminating the groundwater, directly, indirectly and/or via PFAS-contaminated industrial wastewater discharges and air discharges. These PFAS were in the past, and in some cases still today, manufactured and sold by PFAS Manufacturers and/or Fictitious Defendants A-E.

119.     Biosolids discharged and/or land applied in the past and/or currently contain PFAS, which have invaded the environment and groundwater source(s) where Plaintiffs collect their drinking water and ultimately contaminated Plaintiffs' drinking water supply. In addition to discharging PFAS in industrial wastewater, the PFAS Users have also discharged PFAS by way

of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and/or groundwater.

120.    Defendants have known or should have known that PFAS cannot be removed by conventional wastewater treatment methods and that the Defendants' PFAS-contaminated wastewater passes directly through the wastewater treatment system and back into the environment and groundwater in Lee County.

121.    In addition to the aforementioned PFAS discharges, Defendants have also discharged PFAS into the environment, groundwater and surrounding areas by way of land application and stormwater and groundwater discharges.

122.    As a result of Defendants' manufacture, use, disposal, and discharge of PFAS and/or products and waste that contain or degrade into PFAS, dangerously high levels of PFAS have been detected in Plaintiffs' water supply. The levels of PFAS detected exceed EPA's Maximum Contaminant Levels and Maximum Contaminant Level Goals.

123.    Because of their persistence and bioaccumulation, PFAS discharged into Plaintiffs' water source(s) five (5), ten (10), or even twenty (20) years ago are still present in Plaintiffs' water supply and still impacting Plaintiffs' ability to provide clean drinking water to its customers. These "forever chemicals" will continue to pollute Plaintiffs' water supply for generations to come—unless and until they are removed through very specific filtration methods.

124.    Scientific experts, including several of the Defendants' own scientists and consultants, agree that PFOS and PFOA do not readily degrade and will remain in the environment for centuries.

125.    Because Plaintiffs' water treatment system, like most water treatment systems in the country, is incapable of removing PFAS, Plaintiffs' raw and finished water both contain levels

of "forever chemicals" much higher than that which is allowed by EPA under the 2024 National Primary Drinking Water Regulation.

## COUNT I – NEGLIGENCE

126.    Plaintiffs incorporate all prior paragraphs by reference as if fully set forth and restated herein.

127.    Defendants owed a duty to Plaintiffs to exercise reasonable care in their manufacturing procedures and waste-handling and disposal operations to prevent the PFAS contamination of the Plaintiffs' water supply and water treatment system and related property.

128.    As described in detail above, Defendants breached their duty to exercise due care and reasonable care owed to Plaintiffs. The Defendants' breaches of their duties to Plaintiffs constitute negligent, willful, and/or reckless conduct.

129.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and omissions, Plaintiffs have been damaged and have incurred expenses and will continue to incur expenses in the future.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by struck jury in an amount in excess of the jurisdictional minimum of this Court, including past and future damages, plus interest and all recoverable costs.

## COUNT II – PUBLIC NUISANCE
### (Plaintiff Loachapoka)

130.    Plaintiffs reallege all prior paragraphs as if fully restated and set forth herein.

131.    Defendants have created a public nuisance by failing to prevent the contamination of the groundwater where Plaintiff Loachapoka obtains its drinking water and, as a direct result, Plaintiff Loachapoka's water supply, water treatment system, and related property with

Defendants' PFAS, thereby causing Plaintiff Loachapoka hurt, inconvenience, and harm. The nuisance is ongoing.

132. The contamination of Plaintiff Loachapoka's water supply, water treatment system, and related property constitutes a public nuisance, which has caused Plaintiff Loachapoka damages that are separate and distinct from those faced by the general public, including but not limited to: expenses associated with testing, monitoring, installing, maintaining, and operating filtration systems; costs associated with remediating Plaintiff Loachapoka's existing treatment facilities; damage to goodwill and reputation; and lost revenue and sales.

133. In addition to the special damages suffered by Plaintiff Loachapoka, the Defendants' PFAS contamination has created a condition that threatens the health and well-being of residents of Loachapoka, Alabama, including Plaintiff Loachapoka's customers.

134. It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the water at Plaintiff Loachapoka's groundwater well. The nuisance has caused substantial damage and will continue to cause damages until Plaintiff Loachapoka receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Plaintiffs' water supply.

WHEREFORE, Plaintiff Loachapoka demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT III – PRIVATE NUISANCE

135.    Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

136.    Defendants have created a nuisance by their failure to prevent the contamination of PFAS in the Plaintiffs' water supply, thereby causing Plaintiffs hurt, inconvenience, and harm.

137.    The contamination of the water at Plaintiffs' groundwater wells, treatment system, and related property constitutes a private nuisance depriving Plaintiffs of its ability to deliver clean and uncontaminated water to its customers. The nuisance is ongoing.

138.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the Plaintiffs' water supply. The nuisance has caused substantial damage and will continue to cause damages until Plaintiffs receive compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Plaintiffs' water supply.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT IV – TRESPASS

139.    Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

140.    Plaintiffs owns and occupies property used to serve its water customers, including a water treatment system, water distribution system, and offices. Plaintiffs also have a possessory interest in the groundwater where Plaintiffs withdraw drinking water in order to treat and sell to its customers.

141.    Defendants' intentional acts in failing to contain the discharge of PFAS, knowing that they would contaminate Plaintiffs water supply, caused an invasion of Plaintiffs' possessory

interest in its property by Defendants' chemicals, which has affected and is affecting Plaintiffs' interest in the exclusive possession of its property.

142.    Plaintiffs did not consent to the invasion of its property by Defendants' chemicals.

143.    Defendants knew or should have known that their PFAS would contaminate the water supply and result in an invasion of Plaintiffs' possessory interest in its property.

144.    Defendants' trespass is continuing.

145.    Defendants' continuing trespass has impaired Plaintiffs' use of its property and has caused Plaintiffs substantial damages.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

### COUNT V – FAILURE TO WARN
### (PFAS Manufacturers and Fictitious Defendants A-E)

146.    Plaintiffs re-allege all prior paragraphs as if restated herein.

147.    The PFAS Manufacturers and/or Fictitious Defendants A-E had a duty to warn and a continuing duty to warn Plaintiffs, regulators, its customers, Fictitious Defendants F-Z, and the general public of dangers associated with the design, manufacture, disposal, use, and operation of PFAS.

148.    The PFAS Manufacturers and/or Fictitious Defendants A-E are aware, and have been aware for decades, or should have been aware, of the dangers and hazards associated with the design, manufacture, disposal, use, and operation of PFAS.

149.    The PFAS Manufacturers and/or Fictitious Defendants A-E failed to warn the Plaintiffs, regulators, its customers, Fictitious Defendants F-Z, and/or the general public of the problems, risks, hazards and/or dangers associated with PFAS.

150.    The PFAS Manufacturers and/or Fictitious Defendants A-E continue to fail to warn or adequately warn the Plaintiffs, regulators, its customers, Fictitious Defendants F-Z, and/or the general public of the problems, risks, hazards and/or dangers associated with PFAS.

151.    As a direct and proximate result of The PFAS Manufacturers and/or Fictitious Defendants A-E failures to warn of these dangerous and hazardous conditions, Plaintiffs have suffered significant damages, including but not limited to past, present, and future costs associated with remediating and removing PFAS from its drinking water supply.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT VI – WANTONNESS AND PUNITIVE DAMAGES

152.    Plaintiffs re-allege all prior paragraphs as if restated herein.

153.    Defendants owed a duty to Plaintiffs to exercise due and reasonable care in their manufacture, distribution, supply, sales, and/or waste handling and disposal of PFAS to users throughout the State of Alabama and to prevent the discharge of PFAS into the water supply.

154.    In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

155.    Defendants knew or should have known the danger to Plaintiffs created by Defendants' conduct, practices, actions, and inactions.

156.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Plaintiffs.

157.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard of the known risk of harm to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment for punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## RELIEF DEMANDED

Wherefore, Plaintiffs respectfully request this Court grant the following relief:

a)  Award Plaintiffs damages in an amount to be determined by a jury sufficient to compensate Plaintiffs for past and future damage, out-of-pocket expenses, lost profits, lost sales, lost business opportunity and/or lost economic opportunity;

b)  Issue an injunction requiring Defendants to abate their nuisance and/or otherwise remove their chemicals from Plaintiffs' water supply and to prevent these chemicals from continuing to contaminate Plaintiffs' water supply;

c)  Award punitive damages;

d)  Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

e)  Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Respectfully submitted this 9th day of April 2026.

Case 3:36-md-02476-SMD Document 103-34 Filed 06/03/26 Page 44 of 138

**FRIEDMAN, DAZZIO & ZULANAS, P.C.**

| | |
|---|---|
| 3800 Corporate Woods Drive | */s/ Matt Conn* |
| Birmingham, AL 35242 | MATT CONN (CON062) |
| Phone: 205-278-7000 | LEE PATTERSON (PAT060) |
| mconn@friedman-lawyers.com | MADISON LAKES (GIT002) |
| lpatterson@friedman-lawyers.com | ETHAN WRIGHT (WRI082) |
| mlakes@friedman-lawyers.com | **Counsel for Plaintiffs** |
| ewright@friedman-lawyers.com | |

**RILEY & JACKSON, P.C.**

| | |
|---|---|
| 3530 Independence Drive | */s/ Keith Jackson* |
| Birmingham, AL 35209 | KEITH JACKSON (JAC067) |
| Phone: (205)-879-5000 | **Counsel for Plaintiffs** |
| kj@rileyjacksonlaw.com | |

**<u>PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL AT</u>:**

**3M COMPANY**
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

**BRIGGS & STRATTON CORPORATION**
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

**CNJ, INC.**
c/o Kyu Yong Chung
265 Teague Ct
Auburn, AL 36832

**CORTEVA, INC.**
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

**DAIKIN AMERICA, INC.**
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

**DUPONT DE NEMOURS, INC.**
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**E.I. DUPONT DE NEMOURS AND COMPANY**
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

**EIDP, INC.**
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

**INTRAMICRON INC.**
c/o John S. Stein III
3595 Grandview Pkwy Ste 475
Birmingham, AL 35243

**I-PEX USA MANUFACTURING INC.**
c/o Yugo Maeda
239 Technology Parkway
Auburn, AL 36830

**K.C. SOL-TECH, INC.**
c/o Chang Hwan Jang
1500 Pumphrey Ave Ste D
Auburn, AL 36830

**LOTTE CHEMICAL ALABAMA CORP.**
c/o Sang Hyuk Kim
765 W. Veterans Boulevard
Auburn, AL 36832

**NASHVILLE WIRE PRODUCTS MANUFACTURING COMPANY, LLC**
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

- 37 -

**REXNORD INDUSTRIES LLC**

c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

**THE CHEMOURS COMPANY**

c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

**THE CHEMOURS COMPANY FC, LLC**

c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

# EXHIBIT 2

ELECTRONICALLY FILED
4/24/2025 2:53 PM
43-CV-2025-900229.00
CIRCUIT COURT OF
LEE COUNTY, ALABAMA
MARY B. ROBERSON, CLERK

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

| | | |
|---|---|---|
| THE WATER WORKS BOARD OF THE CITY OF OPELIKA, ALABAMA, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case Number: _____ |
| 3M COMPANY; CHROMALLOY GAS TURBINE, LLC; CONTITECH USA, LLC; CORTEVA, INC.; DAIKIN AMERICA, INC., DUPONT DE NEMOURS, INC.; DURACELL MANUFACTURING LLC; E.I. DUPONT DE NEMOURS AND COMPANY; EIDP, INC.; FREUDENBERG-NOK GENERAL PARTNERSHIP; HENKEL US OPERATIONS CORPORATION; INTERFACE, INC.; INTERFACEFLOR, LLC; JFA LLC; KIMBERLY-CLARK CORPORATION; KLEEN-TEX INDUSTRIES, INC.; KLEEN-TEX USA, LLC; MILLIKEN & COMPANY; M+A MATTING, LLC; MOUNTVILLE MILLS, INC.; MOUNTVILLE MILLS INTERNATIONAL, LLC; MOUNTVILLE MILLS RUBBER COMPANY, LLC; MOUNTVILLE MILLS - THE MATWORKS, LLC; SPECIALTY FABRICS & CONVERTING, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; WASTE AWAY GROUP, INC.; WASTE MANAGEMENT, INC.; WEST POINT FOUNDRY AND MACHINE COMPANY; WESTPOINT HOME LLC; WESTROCK PACKAGING SYSTEMS, LLC; and FICTITIOUS DEFENDANTS A-Z, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Case 3:26-cv-02783-SDM Document 68-4 Filed 06/05/25 Page 3 of 138

## COMPLAINT

Plaintiff The Water Works Board of the City of Opelika (hereinafter referred to as "Opelika Water" or "Plaintiff") brings this action against the above-captioned Defendants and sets forth in detail the parties, facts, legal claims, and damages with particularity, as follows:

### STATEMENT OF THE CASE

1. This case arises out of the historic and ongoing manufacture, sale, use, and discharge of per- and poly-fluoroalkyl substances ("PFAS")[1] in commercial applications. This case does not arise out of the use or discharge of Aqueous Film-Forming Foam ("AFFF") or any products used by, supplied to, or manufactured to the specifications of the federal government.

2. The most toxic and studied chemicals in the PFAS group of chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"). These two (2) chemicals are referred to as "C-8" chemistries because they each contain eight (8) fluorinated carbon atoms. Due to the unparalleled strength of the carbon-fluorine bond, PFOS and PFOA will not degrade naturally in the environment. According to the United States Environmental Protection Agency ("EPA"), PFOS and PFOA are considered to be "persistent, bio-accumulative and toxic" ("PBT") and are harmful to public health and the environment.

---

[1] As used herein, "PFAS" refers to all perfluorinated compounds, perfluorochemicals, polyfluorochemicals, perfluoroalkyl substances, polyfluoroalkyl substances, related chemicals that degrade to PFAS, and any precursors to PFAS, including but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), GenX, HFPO-DA, NEtFOSAA, NMeFOSAA, PFBS, PFDA, PFDoA, PFHpA, PFHxS, PFNA, PFTrDA, PFTA, PFUnA, 11Cl0PF3OUdS, 9Cl-PF3ONS, ADONA, PFPeS, PFHpS, 4:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 6:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 8:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), PFBA, PFPeA, PFMBA, PFMPA, PFEESA, PTFE, and NFDHA.

Case Case 6:25-cv-02874-SDM Document 68-1 Filed 06/05/25 Page 56 of 138

3. Because of their persistence in the environment, bioaccumulation in humans, animals and aquatic life, these man-made chemicals exist in the environment for an extraordinarily long time and have been labeled "forever chemicals" by the EPA.

4. PFOS and PFOA chemicals were manufactured for many decades by the Chemical Manufacturer Defendants for use by industrial customers to make waterproof clothing, stain-resistant carpet and textile coatings. The same characteristics that made these synthetic chemicals valued for their ability to repel oil, water, staining and resistant to soil, also make these chemicals resistant to any natural degradation or environmental breakdown. In other words, the same chemical properties that made PFOS and PFOA so valuable and durable as coatings, also made them dangerous to the environment and human health. According to the EPA, ingestion of these chemicals over a period of time can cause cancer and other serious illnesses "that decrease quality of life or result in death."

5. The EPA has advised public drinking water systems to take immediate action to remove "forever chemicals" from public drinking water through the use of "best available technology." The EPA further directed that public water systems must test for levels of PFOS and PFOA and publish the results in their Annual Water Quality Reports with a requirement that test results must be provided to the public "if levels of regulated PFAS exceed [EPA] standards."

6. As of 2024, the EPA has established levels for six (6) PFAS chemicals found in drinking water associated with adverse health effects including liver cancer, kidney cancer, reduced immune system function, lipid levels, reproductive health harm, childhood developmental issues such as low birth weight, endocrine effects and cardiovascular effects. Based on the best available science, the EPA determined there "is no safe level" of PFOS and PFOA in drinking water.

Case 3:25-cv-02431-SDD Document 63-4 Filed 06/05/25 Page 57 of 138

7. Conventional drinking water systems are incapable of removing these "forever chemicals"—such as PFOS and PFOA—from drinking water. Because of the characteristics of these chemicals, they pass through conventional drinking water systems into the environment and eventually into the bloodstream of fish, birds, mammals and the general public.

8. The EPA has found that PFOS and PFOA, as well as certain "short-chain" PFAS, are likely to cause an array of adverse health and environmental effects, including but not limited to, low birth weight in children, miscarriage, and cancer. The current scientific consensus is that there is no safe level of PFOS and PFOA in drinking water.

9. The Defendants in this case, which belong to a variety of different industries, have all caused or contributed—and are continuing to cause or contribute—to these toxic chemicals invading the Plaintiff's drinking water.

10. The Chemical Manufacturer Defendants created and sold these chemicals to industries throughout the State of Alabama and the State of Georgia, with full knowledge of their products' pernicious effects and likelihood of causing pollution to Plaintiff's water supply. Rather than taking efforts to warn or prevent this pollution, these Chemical Manufacturer Defendants actively concealed and withheld information from regulatory agencies, customers, and the general public, all the while causing these chemicals to continuously damage Plaintiff. These Chemical Manufacturer Defendants' efforts to conceal information related to PFAS and mislead regulators and the public continue to this day.

11. The PFAS User Defendants purchased and used PFAS and/or products containing or degrading into PFAS in their industrial processes. These Defendants have continuously caused and permitted PFAS-contaminated waste streams to discharge into the Chattahoochee River, Lake Harding, Halawakee Creek, and the surrounding waterways upstream from where Plaintiff collects

its drinking water. These Defendants do not have authorization to discharge PFAS, and they knew or should have known that their use and discharge of PFAS would pollute Plaintiff's water and cause Plaintiff injury. These Defendants' unauthorized discharges of PFAS upstream of Plaintiff's drinking water intake continue to this day.

12. The Landfill Defendants have continuously accepted, and indeed profited from, PFAS-contaminated waste, which is disposed of in landfills owned and operated by these Defendants. Due to their improper operation of these landfills, the Landfill Defendants have caused and permitted PFAS-contaminated leachate to continuously discharge into the Chattahoochee River, Lake Harding, Halawakee Creek, and the surrounding waterways upstream from where Plaintiff collects its drinking water. These Defendants do not have authorization to discharge PFAS-contaminated leachate, and they knew or should have known that their improper operations and discharge of PFAS would pollute Plaintiff's water and cause Plaintiff injury. These Defendants' improper operation and maintenance and unauthorized discharge of PFAS-contaminated leachate upstream of Plaintiff's drinking water intake continues to this day.

13. All of these Defendants have known for years—sometimes decades—that PFAS (including PFOS and PFOA) should not be discharged via wastewater, stormwater, groundwater, or leachate to wastewater treatment plants or the environment.

14. Nevertheless, the Defendants have jointly and continuously caused these "forever chemicals" to enter the Plaintiff's drinking water.

15. Now, because of the PFAS pollution that Defendants have caused, Opelika Water must find a way to remove these harmful chemicals from its water in order to meet its obligations as a public water provider, comply with federal regulations and guidelines, and most importantly, protect human health and the environment.

16.     The Defendants have known or should have known that Opelika Water, like most public water systems, does not have the treatment technology necessary to remove PFAS from raw water. Therefore, Opelika Water will be required to upgrade to costly and sophisticated new treatment technologies in order to remove Defendants' PFAS from its public water supply.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to Ala. Code § 12-11-30, because the Defendants' wrongful conduct has jointly and severally caused damage to the Plaintiff in Lee County, Alabama, exceeding $20,000.00 as alleged herein and Plaintiff will continue to suffer damages in Lee County in the future.  Plaintiff's real property, which is the subject of this action, is situated in Lee County.

18.     The wrongful acts perpetrated by the Defendants which form the basis of this Complaint, including the ongoing and continuing trespass and the creation of an ongoing and continuing nuisance, occurred and is still occurring in Lee County and has injured and will continue to injure the Plaintiff in Lee County within the applicable statutes of limitations. The Defendants' ongoing and continuing conduct has caused—and will continue to cause—Plaintiff to incur damages within the applicable statutes of limitations.  Plaintiff's cause of action accrued within the applicable statute of limitations.

19.     Venue is proper in this Court pursuant to Ala. Code § 6-3-7, because (i) a substantial part of the events giving rise to this claim occurred in Lee County, (ii) a substantial part of the real property that is the subject of the action is situated in Lee County, (iii) Defendant Waste Away Group, Inc. has its principal office in Lee County, and (iv) Opelika Water resides in Lee County. Further, all Defendants are doing business by agent in Lee County.

## DISCLAIMER

20.     This lawsuit is brought under the laws of the State of Alabama. Plaintiff asserts no federal cause of action, invokes no federal statutes and seeks no relief that is based on any federal statute or laws. Any federal claims are expressly disclaimed by Plaintiff.

21.     Complete diversity does not exist between Plaintiff and all Defendants.

22.     This case arises out of the manufacture, supply, use, and disposal of PFAS in numerous industries, including the carpet, textile, paper and metal finishing/fabricating industries, and Plaintiff makes no claim that the manufacture or use of AFFF in any way caused or contributed to its damages or the claims asserted in this lawsuit. The Defendants in this case are not being sued over the manufacture, supply, use, or discharge of AFFF.

23.     Based upon Plaintiff's investigation into the facts, and upon information and belief, the PFAS currently contaminating Plaintiff's source and drinking water is from industrial sources and is not the result of any AFFF manufactured pursuant to military specifications.

24.     Plaintiff expressly disclaims any cause of action or damages arising from or associated with AFFF manufacture, sale, use or disposal by the named Defendants, or by any unnamed defendant or entities, including any legal or factual claim based on alleged "Mil Spec AFFF." Plaintiff expressly disclaims any potential claims arguably arising from any federal enclaves, including any military installations or other locations that may have used AFFF pursuant to military specifications. This case is brought against the Defendants solely in their capacities as private manufacturers and users of PFAS.

## NO CLASS ACTION PARTICIPATION

25.     Several Defendants in this case have been sued in other cases involving allegations of PFAS pollution to public water systems. In 2023, 3M and DuPont settled nationwide, multi-

district, class-action claims related to the contamination of public water supplies with PFAS for approximately $10 billion and $1 billion, respectively. *See In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) ("*AFFF Litigation*").

26.     Prospective class members in the *AFFF Litigation* had the option of "opting out" of the 3M and DuPont settlements in order to pursue individual lawsuits against 3M and DuPont. Plaintiff validly and timely exercised its right to "opt out" of the *AFFF Litigation* Class Action Settlements with 3M and DuPont to pursue its claims in this lawsuit. Plaintiff has received confirmation from the Notice Administrator overseeing these settlements that its opt-out was in fact "compliant."

27.     On February 26, 2024, and March 29, 2024, Judge Richard Gergel, the United States District Court Judge for the District of South Carolina overseeing the *AFFF Litigation*, entered orders of final approval on the DuPont and 3M settlements, respectively. At no time has 3M, DuPont, or any other party raised objections to Plaintiff's decision to opt-out from the settlements.

28.     Leading up to the 3M and DuPont Class Action settlements, all municipalities, local governments and/or public water systems, such as Opelika Water, were enjoined from filing or prosecuting any legal action against 3M or DuPont related to PFAS contamination pending final approval orders and lifting of the stay and injunction by the Federal District Court in the *AFFF Litigation*.

## PARTIES

### I.    Plaintiff Opelika Water

29.    Plaintiff The Water Works Board of the City of Opelika, located in Lee County, is a public corporation organized under the laws of the State of Alabama, which operates a water system to enhance the health, safety, and general well-being of its citizens.

30.    Opelika Water provides drinking water to the citizens of Opelika, Alabama, and the surrounding areas. Opelika Water owns and operates two separate water treatment plants: the R.A. Betts Plant located at 7472 Lee Road 279, Chambers County, Valley, AL 36854 and the Saugahatchee Lake Plant located at 4055 Water Street, Lee County, Opelika, Alabama 36801. Opelika Water also owns and operates two surface water intakes on the banks of Halawakee Creek/Lake Harding and Saugahatchee Lake, respectfully, that draw raw water from the river/creek/lake and pump it to the plants for treatment. Opelika Water owns these properties and enjoys riparian rights to the water from the Chattahoochee River, Lake Harding, Saugahatchee Creek, Halawakee Creek, Saugahatchee Lake, as well as property rights over the water which it draws, treats, and sells to its customers. Opelika Water also wholesales its treated water to other municipalities in Alabama, including Auburn, Beulah, and Loachapoka.

31.    Opelika Water's conventional water treatment facilities are incapable of removing or treating Defendants' PFAS to levels deemed safe by the federal government.

32.    Opelika Water has been and continues to be damaged due to the negligent, willful, and wanton conduct of the Defendants, as well as a result of the continuous nuisance and trespass caused by Defendants' past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFOS, PFOA and related fluorochemicals, such as PFHxS.

33.     As a direct and proximate result of Defendants' conduct, Opelika Water has suffered, and will continue to suffer, substantial economic and consequential damage, including but not limited to: expenses associated with installing temporary emergency filtration and pumping systems; pilot program costs associated with permanent filtration systems capable of removing Defendants' PFAS from Opelika Water's drinking water; past and future costs associated with the purchase, installation, and operation of permanent filtration systems capable of removing Defendants' PFAS from Opelika Water's drinking water; costs associated with remediating Opelika Water's existing treatment and pumping facilities; damage to goodwill and reputation; and lost revenue and sales. In addition, Opelika Water seeks past, present, and future engineering, operating, and maintenance costs associated with remediation of Defendant's PFAS in Opelika's drinking water.

34.     Opelika Water seeks compensatory and punitive damages to the fullest extent allowed by Alabama law. Opelika Water seeks compensatory damages for filtration equipment, piping, and adequate permanent facilities necessary to operate filtering systems sufficient to remove all PFAS from drinking water. Opelika Water also seeks abatement of the continuous nuisance and trespass caused by Defendants, as well as equitable and injunctive relief compelling the Defendants to remediate their contamination and prevent additional releases of PFAS and other toxic chemicals into Opelika Water's drinking water supply.

## II.    Defendants

### A. Chemical Manufacturers

35.     Defendant 3M Company ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in St. Paul, Minnesota. 3M has knowingly manufactured, sold, used and/or transported PFAS or products that contain

and/or degrade into PFAS in the States of Georgia and/or Alabama, which ultimately end up in the Chattahoochee River basin and Opelika Water's source water supply. PFAS manufactured, sold, used, and/or transported by 3M is currently contaminating Opelika Water's source water. Despite knowing for decades the pernicious effects of its PFAS products, 3M has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. 3M knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Opelika Water's source water. As a result, 3M is causing and contributing to a continuous nuisance, trespass, and injury to Opelika Water in Lee County.

36. Defendant Daikin America, Inc. ("Daikin") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. Daikin is registered to do business in the State of Alabama. Upon information and belief, Daikin is a wholly owned subsidiary of Daikin Industries, Ltd. Daikin has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products which degrade into PFAS in the States of Georgia and/or Alabama, which ultimately end up in the Chattahoochee River basin and Opelika Water's source water supply. PFAS manufactured, sold, used, and/or transported by Daikin is currently contaminating Opelika Water's source water. Despite knowing for decades the pernicious effects of its PFAS products, Daikin has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. Daikin knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Opelika Water's source water.

As a result, Daikin is causing and contributing to a continuous nuisance, trespass, and injury to Opelika Water in Lee County.

37. Defendant E.I. du Pont de Nemours and Company is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware.

38. Defendant DuPont de Nemours, Inc. is a corporation organized under the laws of the State of Delaware. DuPont de Nemours, Inc. does business in the State of Alabama.

39. Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Indianapolis, Indiana. Corteva, Inc. is registered to do business in the State of Alabama.

40. Defendant EIDP, Inc., formerly known as "E.I. du Pont de Nemours and Company," is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. EIDP, Inc. is registered to do business in the State of Alabama.

41. Defendants E.I. du Pont de Nemours and Company, Dupont de Nemours, Inc., Corteva, Inc., and EIDP, Inc. are hereinafter collectively referred to as "DuPont." DuPont has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS in the States of Georgia and/or Alabama, which ultimately end up in the Chattahoochee River basin and Opelika Water's source water supply. PFAS manufactured, sold, used, and/or transported by DuPont is currently contaminating Opelika Water's source water. Despite knowing for decades the pernicious effects of its PFAS products, DuPont has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. DuPont knew or should have known that the PFAS products it supplied

would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Opelika Water's source water. As a result, DuPont is causing and contributing to a continuous nuisance, trespass, and injury to Opelika Water in Lee County.

42. Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. The Chemours Company is registered to do business in the State of Alabama.

43. Defendant The Chemours Company FC, LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. The Chemours Company FC, LLC is registered to do business in the State of Alabama.

44. The Chemours Company and The Chemours Company FC, LLC are hereinafter collectively referred to as "Chemours." Chemours has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS into the States of Georgia and/or Alabama. PFAS manufactured, sold, used, and/or transported by Chemours is currently contaminating Opelika Water's source water. Despite knowing the pernicious effects of its PFAS products, Chemours has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. Chemours knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Alabama, including Opelika Water's source water. As a result, Chemours is causing and contributing to a nuisance, trespass, and injury to Opelika Water in Lee County.

45.     3M, Daikin, DuPont, and Chemours are collectively referred to herein as the Chemical Manufacturer Defendants.

46.     The Chemical Manufacturers have operated in the past, and/or are currently operating, manufacturing facilities related to the production of products and/or chemicals that contain or degrade into certain PFAS, including PFOS and PFOA. The Chemical Manufacturers use PFAS as part of their manufacturing processes or otherwise supply PFAS or products that contain or degrade into PFAS to various industries.

47.     Defendants 3M and Daikin manufactured PFAS and/or products containing or degrading into PFAS at their plants located in Decatur, Alabama.

48.     Upon information and belief, Defendants DuPont and Chemours sold PFAS and/or PFAS-containing products to Daikin at its plant located in Decatur, Alabama.

49.     PFAS, and products that contain or degrade into PFOS and PFOA, are manufactured and sold by the Chemical Manufacturers to the PFAS Users and/or Fictitious Defendants F-U. These products are subsequently discharged both directly and indirectly into the Chattahoochee River, Lake Harding, Saugahatchee Creek, Halawakee Creek, Saugahatchee Lake and other tributaries and watersheds in the surrounding areas.  Defendants' discharges of PFAS occur upstream of Opelika Water's drinking water intake and, as a direct result, contaminate the Opelika Water's drinking water supply.

50.     The Chemical Manufacturers have known for years that PFAS are harmful to human health and resistant to degradation or filtration by conventional treatment systems. The Chemical Manufacturers had full knowledge that the PFAS they manufactured and supplied to industrial users would invade waters of the state of Alabama, including the environment and

surrounding areas from where Opelika Water collects its drinking water, via wastewater effluent and other discharges and ultimately contaminate Opelika Water's drinking water supply.

51.     The "heart" and "gravamen" of Plaintiff's claims against the Chemical Manufacturers is this: these Defendants produced and supplied commercial PFAS-containing products to private industries, with full knowledge that these persistent, bioaccumulative, and toxic substances would contaminate the environment and Plaintiff's source water through wastewater and other manufacturing discharges, all while concealing and withholding critical information regarding the harmful effects of their products.

52.     The Chemical Manufacturers have caused and contributed, and are still causing and contributing to, a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products that contain or degrade into PFAS, as well as their continuing efforts to conceal information related to their products and mislead regulators and the public concerning the pernicious effects of these substances.

**B. PFAS Users**

53.     Defendant Chromalloy Gas Turbine, LLC ("Chromalloy") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Palm Gardens, Florida. Chromalloy is registered to do business in the State of Alabama. Chromalloy operates a gas turbine engine component repair and manufacturing facility located at 1664 W Lukken Industrial Drive, LaGrange, Georgia 30240. Chromalloy's manufacturing operations include thermal coating, surface preparation, and component fabrication and repair. Upon information and belief, Chromalloy has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Chromalloy's manufacturing processes have caused and are continuing to cause

discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Chromalloy is causing and contributing to a nuisance, trespass, and injury to Opelika Water in Lee County.

54. Defendant Duracell Manufacturing LLC ("Duracell"), formerly Duracell Manufacturing, Inc. is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Chicago, Illinois. Duracell does business in the State of Alabama. Duracell owns and operates and/or formerly owned and operated battery manufacturing facilities and/or other buildings located at 1567 W Lukken Industrial Drive; 1512 Redding Drive, LaGrange, Georgia 30240; 1513 Redding Drive, LaGrange, Georgia 30240; and 1514 Redding Drive, LaGrange, Georgia 30240. Upon information and belief, Duracell has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Duracell's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Duracell is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

55. Defendant Freudenberg-NOK General Partnership ("Freudenberg-NOK") is a general partnership organized and existing under the laws of the State of Delaware, with its principal place of business located in Plymouth, Michigan. Freudenberg-NOK does business in the State of Alabama. Freudenberg-NOK operates a rubber manufacturing facility at 1618 W Lukken Industrial Drive, LaGrange, Georgia 30240. Upon information and belief, Freudenberg-NOK has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Freudenberg-NOK manufacturing processes have caused and are continuing to cause discharges of PFAS-

- 16 -

contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Freudenberg-NOK is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

56.     Defendant Henkel US Operations Corporation ("Henkel"), formerly Henkel Corporation, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Rocky Hill, Connecticut. Henkel is registered to do business in the State of Alabama. Henkel operates an adhesives and sealants manufacturing facility at 1600 Executive Dr, LaGrange, GA 30240. Upon information and belief, Henkel has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Henkel's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Henkel is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

57.     Defendant Interface, Inc. is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in Atlanta, Georgia. Interface, Inc. does business in the State of Alabama.

58.     Defendant InterfaceFLOR, LLC is a limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in Atlanta, Georgia. InterfaceFLOR, LLC does business in the State of Alabama.

59.     Interface, Inc. and InterfaceFLOR, LLC are hereinafter referred to as "Interface." Interface currently operates and/or formerly operated commercial flooring and carpet manufacturing facilities at 1503 Orchard Hill Rd, LaGrange, Georgia 30240 ("Kyle 1 Plant"); 140 Glen Long Drive, LaGrange, Georgia 30241 ("Kyle 2 Plant"); 1500 Orchard Hill Rd, LaGrange,

Georgia 30240 ("Kyle 3 Plant"); 1603 Executive Drive, LaGrange, Georgia 30240 ("Graham Scott Technical Center"); 1200 O G Skinner Dr, West Point, Georgia 31833 ("RCA Plant"); and 1707 Shorewood Dr, LaGrange, Georgia 30240. Upon information and belief, Interface has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Interface's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Interface is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

60.     Defendant JFA LLC ("Jindal"), formerly known as "Jindal Films Americas LLC," is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Shawnee, Oklahoma. Jindal does business in the State of Alabama. Jindal formerly operated a films, packaging, and labeling manufacturing facility located at 411 Pegasus Pkwy, Lagrange, Georgia, 30240. PFAS is commonly used in manufacturing processes involving film, packaging, and labeling. Upon information and belief, Jindal has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Jindal's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Jindal is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

61.     Defendant Kimberly-Clark Corporation ("Kimberly-Clark") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Irving, Texas. Kimberly-Clark is authorized to transact business in the State of Alabama. Kimberly-Clark operates a textile manufacturing facility at 1300 Orchard Hill Rd, LaGrange,

Georgia 30240. Upon information and belief, Kimberly-Clark has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Kimberly-Clark's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Kimberly-Clark is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

62.     Defendant Kleen-Tex Industries, Inc. is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in Atlanta, Georgia. Kleen-Tex Industries, Inc. does business in the State of Alabama.

63.     Defendant Kleen-Tex USA, LLC is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in Atlanta, Georgia. Kleen-Tex USA, LLC does business in the State of Alabama.

64.     Defendants Kleen-Tex Industries, Inc. and Kleen-Tex USA, LLC are hereinafter referred to as "Kleen-Tex." Kleen-Tex currently operates and/or formerly operated washable mat manufacturing facilities located at 210 Lukken Industrial Dr E, LaGrange, Georgia 30241; 1602 Orchard Hill Rd, LaGrange, Georgia 30240; and 1516 Orchard Hill Rd, LaGrange, Georgia 30240. Upon information and belief, Kleen-Tex has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Kleen-Tex's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Kleen-Tex is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

65. Defendant Milliken & Company ("Milliken") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Spartanburg, South Carolina. Milliken does business in the State of Alabama. Milliken currently conducts textile manufacturing operations at numerous locations in LaGrange, Georgia such as the Live Oak Plant at 300 Lukken Industrial Drive West, LaGrange, Georgia 30240; the Valway Plant at 1300 4th Avenue, LaGrange, Georgia 30240; the Duncan Stewart/DMS Plant at 714 Stewart Road, LaGrange, Georgia 30241; the Hillside Coating Plant at 1300 Brownwood Avenue, LaGrange, Georgia 30240; and an office/laboratory at 201 Lukken Industrial Drive, LaGrange, Georgia 30240. Upon information and belief, Milliken formerly operated the Elm City Plant at 1005 Elm Street, LaGrange, Georgia 30240 and the Kex Plant at 815 Leeman Street, LaGrange, Georgia 30240. Upon information and belief, Milliken has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Milliken's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Milliken is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

66. Defendant M+A Matting, LLC ("M+A"), formerly known as "MMI Andersen Company, LLC," is a limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in LaGrange, Georgia. M+A does business in the State of Alabama.

67. Defendant Mountville Mills, Inc. is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in LaGrange, Georgia. Mountville Mills does business in the State of Alabama.

- 20 -

68. Defendant Mountville Mills International, LLC is a limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in LaGrange, Georgia. Mountville Mills International, LLC does business in the State of Alabama.

69. Defendant Mountville Mills Rubber Company, LLC is a limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in LaGrange, Georgia. Mountville Mills Rubber Company, LLC does business in the State of Alabama.

70. Defendant Mountville Mills - THE MATWORKS, LLC is a limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in LaGrange, Georgia. Mountville Mills - THE MATWORKS, LLC does business in the State of Alabama.

71. Defendants M+A, Mountville Mills, Inc., Mountville Mills International, LLC, Mountville Mills Rubber Company, LLC, and Mountville Mills - THE MATWORKS, LLC are hereinafter referred to as "Mountville Mills." Mountville Mills operates a textile mill located at 1729 South Davis Road, LaGrange, Georgia, 30241; a rubber product manufacturing plant located at 1602 Orchard Hill Rd, LaGrange, Georgia 30240; and a mat manufacturing facility located at 1516 Orchard Hill Rd, LaGrange, Georgia 30240. Upon information and belief, Mountville Mills acquired Kleen-Tex's North American Mat Division in 2008, and M+A acquired Milliken's North American and European mat businesses in 2022. Upon information and belief, Mountville Mills has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Mountville Mill's manufacturing processes have caused and are continuing to cause discharges of PFAS-

- 21 -

contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Mountville Mills is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

72. Defendant Specialty Fabrics & Converting, Inc. ("Specialty Fabrics") was a corporation organized and formally existing under the laws of the State of Delaware, with its principal place of business located in Hogansville, Georgia. Specialty Fabrics does business in the State of Alabama.

73. Defendant ContiTech USA, LLC ("ContiTech") is a limited liability company organized and existing under the laws of the State of Delaware, with its North American headquarters in Fairlawn, Ohio. ContiTech is registered to do business in the State of Alabama.

74. Defendants Specialty Fabrics and ContiTech are hereinafter referred to as "Specialty Fabrics." Industrial Specialty Fabrics formerly operated an industrial fabric manufacturing facility located at 117 Corinth Road, Hogansville, Georgia 30230. Upon information and belief, Veyance Technologies, Inc. ("Veyance") purchased the assets of Industrial Specialty Fabrics and renamed the fabric operation, "Specialty Fabrics & Converting, Inc.," in 2007. In 2015, Continental AG ("Continental") acquired Veyance, integrating its operations into Continental's ContiTech division. Upon information and belief, Specialty Fabrics has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and Specialty Fabric's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, Specialty Fabrics is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

75. Defendant West Point Foundry and Machine Company ("West Point Industries"), doing business as "West Point Industries", is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in West Point, Georgia. West Point Industries does business in the State of Alabama. West Point Industries operates a casting, fabrication, and machining facility located at 2021 Stateline Road, West Point, Georgia 31833. Upon information and belief, West Point Industries has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and West Point Industries' manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, West Point Industries is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

76. Defendant WestPoint Home LLC ("WestPoint Home") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in New York, New York. WestPoint Home is registered to do business in the State of Alabama. WestPoint was formerly known as "WestPoint Home, Inc.," which was the result of mergers of three textile companies: J.P. Stevens & Co., Inc., Pepperell Manufacturing Company, and West Point Manufacturing Company. WestPoint Home currently operates an outlet store located at 523 Fob James Dr, Valley, Alabama 36854, which is not currently believed to be contributing to the contamination of Plaintiff's source water supply. Upon information and belief, WestPoint Home formerly operated several textile manufacturing facilities in or around LaGrange, Georgia; Valley, Alabama; and Opelika, Alabama. Upon information and belief, WestPoint Home has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and WestPoint Home's

- 23 -

manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, WestPoint Home is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

77.     Defendant WestRock Packaging Systems, LLC ("WestRock") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Sandy Springs, Georgia. WestRock is registered to do business in the State of Alabama. WestRock operates a folding carton packaging facility located at 3500 45th St SW, Lanett, Alabama 36863. WestRock also operates a distribution center located at 1479 Valley Industrial Drive Valley, Alabama, 36854, which is not currently believed to be contributing to the contamination of Plaintiff's source water supply. Folding carton packaging processes are known to use PFAS to make materials grease-proof and water-resistant. Upon information and belief, WestRock has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturers and/or Fictitious Defendants A-E for use in its manufacturing processes, and West Rock's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Opelika Water's drinking water source. As a result, WestRock is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Lee County.

78.     The PFAS Users have in the past and/or currently own and/or operate manufacturing facilities related to the carpet, coating, flooring, textile, metal fabrication, and paper industries, which have in the past and/or currently use PFAS in their manufacturing processes. These facilities are located upstream of Opelika Water's drinking water intake located at Halawakee Creek.

79. Industrial wastewater discharged in the past and currently from the PFAS Users' manufacturing facilities contains high levels of PFAS, which have invaded the environment where Opelika Water collects its drinking water. In addition to discharging PFAS in industrial wastewater, the PFAS Users have also discharged—and are continuing to discharge—PFAS by way of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and groundwater.

80. The PFAS Users knew or should have known that PFAS are harmful to human health and the environment, and that their PFAS-contaminated waste streams would invade and persist in the environment and Opelika Water's drinking water supply.

81. The PFAS Users have known or should have known that the release of PFAS into the environment through wastewater, stormwater and other discharges is prohibited by the PFAS Users' operative permits and/or applicable state and local laws and regulations.

82. The PFAS Users have caused and contributed, and are still causing and contributing, to a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products containing or degrading into PFAS.

**C. Landfill Defendants**

83. Defendant Waste Away Group, Inc. ("WAG") is a domestic corporation organized under the laws of the State of Alabama. WAG owns and/or operates the Salem Landfill located at 4210 Lee Road 183, Opelika, Alabama 36804.

84. Defendant Waste Management, Inc. ("WM") is a corporation organized under the laws of the State of Delaware and does business in the State of Alabama. WM owns, operates and/or maintains the Salem Landfill.

85. The Salem Landfill accepts industrial waste, wastewater, biosolids, sludge, and other forms of waste that contain and/or degrade into PFAS. Through its unauthorized direct and indirect discharge of wastewater, stormwater, and/or leachate contaminated with PFAS, the Salem Landfill is causing and contributing to a nuisance, trespass, and injury in Lee County, Alabama.

86. The Landfill Defendants own, operate and/or maintain the Salem Landfill, which has accepted PFAS-contaminated wastes from the PFAS Users and other sources and thereafter improperly discharged PFAS-contaminated leachate into an unnamed tributary to Halawakee Creek directly and/or via leachate disposal into wastewater treatment plants. The Landfill Defendants are not permitted or authorized to discharge leachate contaminated with PFAS, and knew or should have known that their discharges of PFAS-contaminated leachate would invade Opelika Water's source of drinking water. In some instances, these discharges began over thirty (30) years ago and yet continue to this day.

87. The Landfill Defendants' continuing discharges of PFAS occur upstream of Plaintiff's drinking water intake and, as a direct result, contaminate the Plaintiff's water supply.

**D. Fictitious Defendants**

88. Fictitious Defendants A-E, whether singular or plural, entity or entities, are those defendants who have operated in the past, and/or are currently operating, manufacturing facilities related to the production of products and/or chemicals that contain or degrade into certain PFAS chemicals, including PFOS and PFOA, and that have sold PFAS and/or products that contain or degrade into PFAS, to the PFAS Users and/or Fictitious Defendants F-U, which are subsequently discharged both directly and indirectly into the Chattahoochee River, Lake Harding, Saugahatchee Creek, Halawakee Creek, Saugahatchee Lake and other tributaries and watersheds in the

surrounding areas, upstream of Plaintiff's drinking water intake and, as a direct result, contaminate the Plaintiff's water, similar to the Chemical Manufacturers in Section II.A.

89. Fictitious Defendants F-U, whether singular or plural, entity or entities, are those defendants who have owned and/or operated in the past, and/or currently own and/or operate, manufacturing facilities or related properties which have purchased, used and/or utilized PFAS in their manufacturing processes and discharged wastewater containing PFAS into the environment and/or surface water source(s) where Plaintiff collects its drinking water, whether directly or indirectly, similar to the PFAS Users in Section II.B. Fictitious Defendants F-U also include those defendants who have discharged and/or continue to discharge PFAS from manufacturing facilities or related properties by way of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and groundwater and contaminate Plaintiff's drinking water supply.

90. Fictitious Defendants V-Z, whether singular or plural, entity or entities, are those defendants who owned, operated and/or maintained, and/or currently own, operate and/or maintain, a landfill or other waste disposal facility/site that has accepted PFAS-contaminated wastes from the PFAS Users and/or other sources (including Fictitious Defendants F-U) and thereafter discharged PFAS-contaminated wastewater, stormwater and/or leachate, directly or indirectly, into the water source(s) where Plaintiff collects its drinking water and ultimately contaminate Plaintiff's drinking water supply, similar to the Landfill Defendants in Section II.C.

91. Plaintiff avers that the identities of Fictitious Defendants A-Z are otherwise unknown to Plaintiff at this time, or if their names are known to Plaintiff, their identities as proper party defendants are not known to Plaintiff at this time and/or their actions/omissions as liable

parties are not known to Plaintiff at this time, and their true names will be substituted by amendment when ascertained.

### E. All Defendants

92. The PFAS manufactured and sold by the Chemical Manufacturers, purchased, used, and discharged by the PFAS Users, and/or accepted and subsequently discharged by the Salem Landfill, resist degradation, including during processing at wastewater treatment facilities, and ultimately contaminate Halawakee Creek, Lake Harding and other tributaries and watersheds in Lee County, Alabama.

93. Defendants, individually and collectively, have caused or contributed to cause continuous PFAS pollution in the environment and the surface water in and around Lee County and Chambers County, Alabama. Defendants' PFAS cannot be adequately removed from the Plaintiff's water supply by existing water treatment processes and technologies presently in use and available at Plaintiff's water treatment facilities.

## FACTUAL ALLEGATIONS

### I. Defendants Have Known for Decades That "Long-Chain" PFAS are a Threat to Human Health and the Environment.

94. PFAS are man-made, synthetic chemicals used to impart oil-, water-, and stain-resistance to various products, including carpet, paper, and textiles. The same chemical properties that provide enhanced soil-resistant attributes also make PFAS resistant to degradation and persistent in the environment.

95. PFAS are known to the EPA and the Defendants as "forever chemicals" because these man-made chemicals persist in the environment for extremely long periods and do not degrade like other chemicals. PFAS accumulate in the human body through the process of bioaccumulation. In fish and mammals, PFAS accumulate, build, and increase though

biomagnification. PFAS also migrate through surface water and groundwater, allowing PFAS compounds to travel long distances while causing extensive contamination.

96. Since PFAS do not degrade naturally and are synthetic "forever chemicals," PFAS released into the environment ten (10), twenty (20), or thirty (30) years ago will remain present and will continue causing pollution that is a threat to public health, unless removed by very specific filtration methods.

97. Although there are thousands of chemical substances that fall under the PFAS umbrella, the two most notorious PFAS chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"). These two (2) chemicals are also referred to as C-8s and/or long-chain fluorochemicals.

98. PFOS and PFOA are considered "long-chain" PFAS (sometimes referred to as "C-8" chemistries), because they contain eight (8) fluorinated carbon atoms. Defendants knew that, because of the strong carbon-fluorine bond, PFOS and PFOA will not degrade naturally in the environment.

99. According to the EPA, 3M was the sole manufacturer of PFOS in the United States and the principal manufacturer of PFOS worldwide. Upon information and belief, 3M supplied PFOS and/or products containing or degrading into PFOS to the PFAS Users for use in their manufacturing processes.

100. DuPont, Daikin, and 3M all manufactured PFOA and/or products containing or degrading into PFOA. Upon information and belief, DuPont, Daikin, and 3M supplied PFOA and/or products containing or degrading into PFOA to the PFAS Users for use in their manufacturing processes.

101. 3M and DuPont began studying the toxicity of PFOS and PFOA as early as the 1950s and 1960s.

102. By the 1970s, 3M and DuPont were aware that their products persisted indefinitely in the environment. 3M also learned during this time that PFOS was present in the blood of its employees and the general public.

103. In the 1970s and 1980s, 3M began conducting animal studies to determine the possible carcinogenicity of PFAS chemicals. One such study, an investigation into the effects of PFOS on rhesus monkeys, had to be aborted prior to the conclusion of the study "[b]ecause of unexpected early mortalities in all monkeys at all levels" of PFOS dosage. In 1978, a 3M interoffice correspondence concluded that "[r]ecent animal studies have shown that FC-95 [PFOS] is more toxic than was previously believed."

104. By the 1980s and 1990s, 3M and DuPont were fully aware that PFOS and PFOA were toxic and persistent in the environment and that conventional treatment methods were ineffective at removing these pollutants. Nevertheless, the two companies actively hid their findings from regulators and the general public. In 1988, a 3M internal memo raised concerns that 3M had "perpetuate[d] the myth that these fluorochemical surfactants are biodegradable."

105. In 1997, 3M prepared a Material Safety Data Sheet (MSDS) for a product containing PFAS. The MSDS contained the following warning:

CANCER:
WARNING: Contains a chemical which can cause cancer. (3825-26-1) (1983 and 1993 studies conducted jointly by 3M and DuPont).

106. This warning was removed from subsequent MSDSs.

107. In the late 1990s, 3M began a comprehensive, multi-city investigation into the extent of its PFAS pollution. It found an unending cycle of pollution in which Chemical

Manufacturers, PFAS Users, and Landfills all play a role in continuing the invasion of PFAS in surface and groundwater, wastewater, and ultimately, drinking water.

108. 3M also concluded during this investigation that reverse osmosis is the only treatment method capable of removing all PFAS.

109. In 1999, Richard Purdy, one of 3M's lead scientists on the multi-city study, resigned from his position due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors."

110. Mr. Purdy's letter, which was also sent to a representative of the EPA, further stated that PFOS "is the most insidious pollutant since PCB" and "more stable than many rocks."

111. Following Mr. Purdy's letter, the EPA began an investigation into PFOS after receiving data that "PFOS was persistent, unexpectedly toxic, and bioaccumulative (PBT)." Federal Register/Vol. 68, 2003.

112. During its subsequent investigation of 3M, the EPA disclosed that "following negotiations with EPA, 3M . . . announced that it will voluntarily phase out perfluorooctanyl sulfonate ("PFOS") chemistry." The EPA determined that PFOS was toxic and accumulated to a high degree in humans and animals. The EPA's preliminary risk assessment found unacceptable margins of exposure for workers and possibly the general population exposed to PFOS.

113. The EPA concluded that "PFOS represents an unacceptable technology that should be eliminated to protect human health and the environment from potentially severe long-term consequences." Shortly thereafter, the EPA expanded its investigation to perfluorooctanoic acid (PFOA), stating "EPA was concerned in part because 3M had also found PFOA in human blood during the studies on PFOS."

114. After 3M announced that it was withdrawing PFOS and PFOA from the market in 2000, DuPont and Daikin continued to manufacture and/or use PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

115. Upon information and belief, the PFAS Users continued to purchase, use, and discharge PFOA and products containing or degrading into PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

116. By 2006, the majority of an EPA Science Advisory Board expert committee had recommended that PFOA be considered "likely to be carcinogenic to humans." Similarly, an independent C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure, based on epidemiological and other data in the Mid-Ohio Valley.

117. Despite the growing awareness that PFOA was just as persistent, bio-accumulative, and toxic as PFOS, DuPont and Daikin continued to manufacture and supply PFOA and products containing and/or degrading into PFOA until at least 2015.

118. All of the Defendants have known that PFOS and PFOA are toxic, persistent, and bioaccumulative.

119. All of the Defendants have known or should have known that the ordinary usage of products containing or degrading to PFAS in manufacturing processes will cause PFAS to discharge into the environment via industrial wastewater effluent, stormwater runoff or other discharges.

120. All of the Defendants have known that permits and/or state and local laws and regulations prevent the discharge of PFAS into conventional wastewater treatment plants incapable of removing or treating PFAS.

121. All of the Defendants have known that the PFAS products used by the PFAS Users would ultimately enter the Plaintiff's drinking water supply, and that Plaintiff's conventional drinking water treatment systems are incapable of removing PFOS and PFOA from water supplies.

122. Nevertheless, the Defendants in this case supplied, used, purchased, and/or accepted PFOS and PFOA, and/or products containing or degrading into PFOS and PFOA, without using adequate care to prevent the contamination of Plaintiff's water supply.

123. PFAS manufactured, used, and discharged by the Defendants are still present at dangerously high levels in Plaintiff's drinking water supply. Some of these Defendants are still discharging wastewater, leachate, stormwater and/or other types of discharges containing PFAS into the Plaintiff's water supply.

## II. "Short-Chain" PFAS

124. After 3M phased out "long-chain" PFAS, it began selling "short-chain" PFAS compounds (sometimes referred to as "C-6" and "C-4" chemistries), and/or products that contained or degraded into "short-chain" PFAS, to the PFAS Users. DuPont and Daikin eventually converted to "short-chain" PFAS as well.

125. In or around 2015, DuPont spun off its Performance Chemicals business line into a new company, Chemours, which continued selling and marketing "short-chain" PFAS, including but not limited to HFPO-DA (or "Gen-X").

126. The "short-chain" PFAS compounds sold and/or used by the Chemical Manufacturers included and/or degraded into PFBS, PFBA, PFHxA, PFHxS, PFNA, PFPeA, Gen-X, and more.

127. Defendants knew or should have known that that these "short-chain" PFAS compounds were just as toxic, persistent, and bioaccumulative as their "long-chain" predecessors. Defendants also knew or should have known that conventional drinking water treatment systems are incapable of removing "short-chain" PFAS from water supplies. Nevertheless, Defendants supplied, used, purchased, and/or accepted "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiff's water supply.

128. Some short-chain PFAS actually contain PFOA (a toxic C-8 chemical) as a byproduct and/or an impurity. So, while advertising their short-chain PFAS as an alternative to long-chain C-8s, the Chemical Manufacturers were continuing to manufacture and sell their most toxic chemicals to customers and, in turn, putting these chemicals into waste streams and the environment.

129. Upon information and belief, Defendants continue to supply, use, purchase, accept, and/or discharge "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiff's water supply, to this day.

**III. "End-of-Life" PFAS Management**

130. According to the EPA, Subtitle D (Municipal Solid Waste) landfills represent significant sources of PFAS to the environment, particularly those landfills that accept "special

waste" containing higher concentrations of PFAS, such as wastewater sludge or manufacturing waste.

131. Because of these concerns, the EPA officially recommends disposal of PFAS waste at Subtitle C (Hazardous Waste) landfills, particularly when the levels of PFAS in landfill waste are relatively high. Subtitle C landfills are subject to more stringent containment requirements than traditional Subtitle D landfills.

132. The Salem Landfill is a Subtitle D landfill that accepts both regular household waste and PFAS-containing special waste from industrial manufacturing facilities. Upon information and belief, the Salem Landfill also accepts, or has accepted in the past, wastewater treatment plant sludge that contains PFAS.

133. Leachate is a form of liquid waste present in Subtitle D landfills, like the Salem Landfill. According to the EPA, leachate forms when rainwater percolates through landfill wastes, leaching chemicals or constituents from those wastes. In essence, landfill leachate takes on the chemical characteristics of the landfill waste that it passes through.

134. Landfill leachate is typically either treated on-site or shipped off-site to a municipal wastewater treatment plant for treatment.

135. When rainwater comes into contact with the PFAS-containing waste within the Salem Landfill, it generates PFAS-contaminated leachate. Upon information and belief, the Salem Landfill's leachate contains high levels of PFAS, including PFOS and PFOA.

136. The Salem Landfill discharges its PFAS-contaminated leachate directly into an unnamed tributary to Halawakee Creek, in violation of its applicable permits, and/or via leachate disposal into wastewater treatment plants.

137.    The Landfill Defendants have known for years that industrial wastes containing PFAS can contaminate both on-site and off-site groundwater and surface water.

138.    The presence of PFAS in landfill waste—and, as a result, landfill leachate, groundwater and surface water—has been widely reported on in newspapers, trade publications, and scholarly reports for more than a decade.

139.    Likewise, solid waste industry groups, such as the Solid Waste Association of North America, have for years published reports to the solid waste industry that conventional wastewater treatment plants are incapable of removing PFAS from leachate and that reverse osmosis and granular activated carbon are commercially-proven options for leachate PFAS removal.

140.    The Landfill Defendants hold themselves out as experts in PFAS disposal and management, with on-site pretreatment options, Subtitle C Hazardous Landfills, and other technologies capable of limiting the re-introduction of PFAS into the environment.

141.    Despite the Landfill Defendants' knowledge concerning the potential for PFAS-contaminated landfill leachate to harm the environment and public health, the Landfill Defendants have failed to prevent the escape and discharge of PFAS-contaminated leachate from its landfill, in violation of its permits.

142.    The Landfill Defendants have known, or should have known, for years that they cannot prevent the escape and discharge of PFAS-contaminated leachate into the environment, yet the Salem Landfill continues to this day to accept PFAS-contaminated special waste.

## IV.    PFAS Regulations

143.    In May of 2016, EPA published a Lifetime Health Advisory for drinking water setting the levels at 70 ppt *combined* for PFOA and PFOS. This Health Advisory was based on "studies of the effects of PFOA and PFOS on laboratory animals" and "epidemiological studies to human populations" which "indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."

144.    In March 2023, EPA proposed a National Primary Drinking Water Regulation ("NPDWR") to establish legally enforceable Maximum Contaminant Levels ("MCLs") for six PFAS in drinking water: PFOA, PFOS, PFBS, PFNA, PFHxS, and Gen-X.

145.    On April 10, 2024, EPA announced the final, enforceable NPDWR for these six PFAS.

146.    Under the NPDWR, public water systems, like Plaintiff's, will be required to monitor and report concentrations of PFAS in their drinking water. The NPDWR will also require public water systems to provide drinking water with no more than 4 ppt PFOS, 4 ppt PFOA, 10 ppt PFHxS, 10 ppt PFNA, or 10 ppt Gen-X.

147.    Moreover, the NPDWR will require that public water systems, like Plaintiff's, remove PFBS, PFNA, PFHxS, and Gen-X from their drinking water pursuant to a Hazard Index. Under this Hazard Index, *combined* concentrations of these compounds can constitute a violation even where each *individual* compound is lower than the MCL. By way of example, drinking water

with 9 ppt Gen-X, 100 ppt PFBS, 4 ppt PFNA, and 3 ppt PFHxS would constitute a violation of the Hazard Index even though each individual concentration is below the MCL.

148. In announcing the new regulations, EPA stated that it "expects that over many years the final rule will prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses." Pursuant to the NPDWR, EPA also established "health-based" Maximum Contaminant Level Goals ("MCLGs") for PFOA and PFOS at zero ppt.

149. The EPA explained the decision-making process behind the MCLGs: "Following a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

150. Finally, on April 19, 2024, the EPA formally designated PFOA and PFOS as "Hazardous Substances" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERLCA"). According to the EPA, the designation of PFOA and PFOS as "Hazardous Substances" under CERCLA "is designed to ensure that those responsible for contamination pay to clean it up."

## V. Fate and Transport

151. All of the Defendants have caused or contributed to the PFAS in the Chattahoochee River basin, Halawakee Creek, and Plaintiff's source water supply.

152. Upon information and belief, the following Defendants have manufactured, formulated, sold, supplied and/or transported PFAS and/or PFAS-containing products to PFAS Users that were ultimately discharged, directly or indirectly, into Plaintiff's water supply: 3M, Chemours, Daikin, DuPont and/or Fictitious Defendants A-E.

153. Upon information and belief, the following Defendants have directly discharged, whether through an NPDES permit or otherwise, PFAS and/or wastewater containing PFAS into the Chattahoochee River basin and Plaintiff's source water supply: Kimberly-Clark, Milliken, Specialty Fabrics, WestRock, and/or Fictitious Defendants F-U.

154. Upon information and belief, the following Defendants have discharged PFAS and/or wastewater containing PFAS to the City of LaGrange, which passed through the wastewater treatment system and into the Chattahoochee River basin, Halawakee Creek, and Plaintiff's source water supply: Chromalloy, Duracell, Freudenberg NOK, Interface, Jindal, Kimberly-Clark, Kleen-Tex, Milliken, Mountville Mills, WestPoint Home, and/or Fictitious Defendants F-U.

## VI.  PFAS POLLUTION IN AND AROUND PLAINTIFF'S WATER SUPPLY

155. Plaintiff draws its primary source water from Halawakee Creek, which is on Lake Harding, and is treated at the Robert A. Betts Water Treatment Plant ("RA Betts WTP"). Lake Harding and Halawakee Creek are part of the Chattahoochee River basin. Plaintiff also has a secondary water supply at Saugahatchee Lake ("Saugahatchee WTP").

156. PFAS pollution caused by the Defendants has jeopardized the safety of the Plaintiffs' raw water and drinking water sources and related tributaries and watersheds as an ongoing source of drinking water for the residents of Lee County, Alabama, and the surrounding areas.

157. Upstream from Opelika Water's RA Betts WTP drinking water intake, the PFAS Users operate manufacturing facilities that in the past and/or currently discharge PFAS into the Chattahoochee River directly and/or via PFAS-contaminated industrial wastewater discharges to wastewater treatment plants incapable of removing PFAS. These PFAS were in the past, and in some cases still today, manufactured and sold by the Chemical Manufacturers.

158. WAG and/or WM own, operate and maintain the Salem Landfill that has accepted PFAS-contaminated wastes from the PFAS Users and other sources and thereafter discharged PFAS-contaminated leachate into an unnamed tributary to Halawakee Creek directly and/or via leachate disposal into wastewater treatment plants. In some instances, the discharges began over thirty (30) years ago and yet continue to this day.

159. Defendants have known or should have known that PFAS cannot be removed by conventional wastewater treatment methods and that the Defendants' PFAS-contaminated wastewater passes directly through the wastewater treatment system and back into the aforementioned waterways upstream of Opelika Water's drinking water intake.

160. As a result of Defendants' manufacture, use, disposal, and discharge of PFAS and/or products and waste that contain or degrade into PFAS, dangerously high levels of PFAS have been detected in the waterways surrounding Plaintiff's drinking water intakes and related tributaries and watersheds. The levels of PFAS detected far exceed EPA's most recent Health Advisory and proposed Maximum Contaminant Levels and Maximum Contaminant Level Goals.

161. Levels of PFOS and PFOA have been detected at the R.A. Betts Plant as high as 8.4 ppt and 13.0 ppt, respectively.

162. PFOS and PFOA have also been detected at the Saugahatchee WTP.

163. Short-chain PFAS have also been detected at both of Plaintiff's Water Treatment Plants, including PFHxS at RA Betts WTP.

164. Because of their persistence and bioaccumulation, PFAS discharged into the waterways that supply Plaintiff's drinking water five (5), ten (10), or even twenty (20) years ago are still present in Plaintiff's water supply and still impacting Plaintiff's ability to provide clean drinking water to its customers. These "forever chemicals" will continue to pollute Plaintiff's

water supply for generations to come—unless and until they are removed through very specific filtration methods.

165. Scientific experts, including several of the Defendants' own scientists and consultants, agree that PFOS and PFOA do not readily degrade and will remain in the environment for centuries.

166. Because Plaintiff's water treatment plants, like most water treatment plants in the country, are incapable of removing PFAS, Plaintiff's raw and finished water both contain levels of "forever chemicals" much higher than that which is allowed by EPA under the 2022 Health Advisory and the 2024 National Primary Drinking Water Regulation.

## COUNT I – NEGLIGENCE

167. Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

168. Defendants owe a duty to Plaintiff to exercise reasonable care in their manufacturing procedures and waste-handling and disposal operations to prevent the PFAS contamination of the Plaintiff's water supply and water treatment system and related property.

169. As described in detail above, Defendants have breached their duty to exercise due care and reasonable care owed to Plaintiff. The Defendants' breaches of their duties to Plaintiff constitute negligent, willful, and/or reckless conduct.

170. As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and omissions, Plaintiff has been damaged and has incurred expenses and will continue to incur expenses in the future.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by struck jury in an amount in

excess of the jurisdictional minimum of this Court, including past and future damages, plus interest in all recoverable costs.

## COUNT II – PUBLIC NUISANCE

171.  Plaintiff realleges all prior paragraphs as if fully restated and set forth herein.

172.  Defendants have created and continue to create and contribute to a public nuisance by failing to prevent the contamination of the surface water where Plaintiff obtains its drinking water and, as a direct result, Plaintiff's water supply, water treatment system, and related property with Defendants' PFAS, thereby causing Plaintiff hurt, inconvenience, and harm. The nuisance is ongoing.

173.  The contamination of Plaintiff's water supply, water treatment system, and related property constitutes a public nuisance, which is causing Plaintiff damages that are separate and distinct from those faced by the general public, including but not limited to: expenses associated with installing, maintaining, and operating filtration systems; costs associated with remediating Plaintiff's existing treatment facilities; damage to goodwill and reputation; and lost revenue and sales.

174.  In addition to the special damages suffered by Plaintiff, the Defendants' PFAS contamination has created a condition that threatens the health and well-being of residents of Opelika and Lee County, Alabama, including Plaintiff's customers.

175.  It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the water at Plaintiff's groundwater wells. The nuisance has caused substantial damage and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Plaintiff's water supply.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT III – PRIVATE NUISANCE

176.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

177.    Defendants have created and are continuing to create and contribute to a nuisance by their failure to prevent the contamination of PFAS in the Plaintiff's water supply, thereby causing Plaintiff hurt, inconvenience, and harm.

178.    The contamination of the water at Plaintiff's reservoirs or surface water sources, treatment systems, and related property constitutes a private nuisance depriving Plaintiff of its ability to deliver clean and uncontaminated water to its customers. The nuisance is ongoing.

179.     It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the water at Plaintiff's reservoirs or surface water sources. The nuisance has caused substantial damage and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Plaintiff's water supply.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT IV – TRESPASS

180.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

181.    Plaintiff owns and occupies property used to serve its water customers, including water treatment systems, water distribution system, and offices. Plaintiff also has a possessory

- 43 -

interest in the groundwater where Plaintiff withdraws its drinking water in order to treat and sell to its customers.

182. Defendants' intentional acts in failing to contain the discharge of PFAS, knowing that they would contaminate Plaintiff's water supply, caused an invasion of Plaintiff's possessory interest in its property by Defendants' chemicals, which has affected and is affecting Plaintiff's interest in the exclusive possession of its property.

183. Plaintiff did not consent to the invasion of its property by Defendants' chemicals.

184. Defendants knew or should have known that their PFAS would contaminate the water supply and result in an invasion of Plaintiff's possessory interest in its property.

185. Defendants' trespass is continuing.

186. Defendants' continuing trespass has impaired Plaintiff's use of its property and has caused Plaintiff substantial damages.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT V – WANTONNESS AND PUNITIVE DAMAGES

187. Plaintiff re-alleges all prior paragraphs as if restated herein.

188. Defendants owe a duty to Plaintiff to exercise due and reasonable care in their manufacture, distribution, supply, sales, and/or waste handling and disposal of PFAS to users throughout the State of Alabama and to prevent the discharge of PFAS into the water supply.

189. In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

- 44 -

190. Defendants knew or should have known the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

191. Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Plaintiff.

192. Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard of the known risk of harm to Plaintiff.

WHEREFORE, Plaintiff demands judgment for punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## RELIEF DEMANDED

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a) Award Plaintiff damages in an amount to be determined by a jury sufficient to compensate Plaintiff for past and future damage, out-of-pocket expenses, and lost profits and sales;

b) Issue an injunction requiring Defendants to abate their nuisance and/or otherwise remove their chemicals from Plaintiff's water supply and to prevent these chemicals from continuing to contaminate Plaintiff's water supply;

c) Award punitive damages;

d) Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

e) Award such other and further relief as this Court may deem just, proper, and equitable.

**JURY DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS

CAUSE.

Respectfully submitted this 24th day of April 2025.

**FRIEDMAN, DAZZIO & ZULANAS, P.C.**

| | |
|---|---|
| 3800 Corporate Woods Drive | */s/ Matt Conn* |
| Birmingham, AL 35242 | MATT CONN (CON062) |
| Phone: 205-278-7000 | LEE PATTERSON (PAT060) |
| mconn@friedman-lawyers.com | MADISON GITSCHIER (GIT002) |
| lpatterson@friedman-lawyers.com | ETHAN WRIGHT (WRI082) |
| mgitschier@friedman-lawyers.com | **Counsel for Plaintiff** |
| ewright@friedman-lawyers.com | |

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL AT:**

3M COMPANY
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

CHROMALLOY GAS TURBINE LLC
c/o Corporation Service Company
4100 RCA Boulevard, Suite 100
Palm Gardens, FL 33410

CONTITECH USA, LLC
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

CORTEVA, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

DAIKIN AMERICA, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

- 46 -

Case 3:26-md-03076-ZNQ-TJB Document 44-4 Filed 06/05/26 Page 100 of 138

DUPONT DE NEMOURS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DURACELL MANUFACTURING, LLC
c/o CT Corporation System
289 S Culver Street
Lawrenceville, GA, 30046

E.I. DUPONT DE NEMOURS AND COMPANY
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

EIDP, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

FREUDENBERG-NOK GENERAL PARTNERSHIP
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

HENKEL US OPERATIONS CORPORATION
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

INTERFACE, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

INTERFACEFLOR, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

JFA LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

KIMBERLY-CLARK CORPORATION
c/o CT Corporation System
289 S Culver Street
Lawrenceville, GA 30046

KLEEN-TEX INDUSTRIES, INC.
c/o Bruce Howard
210 Lukken Industrial Drive East
Lagrange, GA 30241

KLEEN-TEX USA, LLC
c/o Bruce Howard
210 Lukken Industrial Drive East
Lagrange, GA 30241

MILLIKEN & COMPANY
c/o CT Corporation System
289 S Culver Street
Lawrenceville, GA 30046

M+A MATTING, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

MOUNTVILLE MILLS, INC.
c/o Jonathan Brock Morman
201 Ridley Avenue, Suite B
LaGrange, GA 30240

MOUNTVILLE MILLS INTERNATIONAL, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

MOUNTVILLE MILLS RUBBER COMPANY, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

MOUNTVILLE MILLS - THE MATWORKS, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

SPECIALTY FABRICS & CONVERTING, INC.
c/o Continental
Attention General Counsel
1830 MacMillan Park Drive
Fort Mill, SC, 29707

THE CHEMOURS COMPANY
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

THE CHEMOURS COMPANY FC, LLC
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

WASTE AWAY GROUP, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

WASTE MANAGEMENT, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

WEST POINT FOUNDRY AND MACHINE COMPANY
c/o William Huguley IV
2021 State Line Road
West Point, GA, 31833

WESTPOINT HOME, LLC
c/o Paracorp Incorporated
2 North Jackson Street Suite 605
Montgomery, AL 36104

WESTROCK PACKAGING SYSTEMS, LLC
c/o Corporation Service Company Inc.
641 South Lawrence Street
Montgomery, AL 36104

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| THE WATER WORKS BOARD OF THE CITY OF OPELIKA, ALABAMA,<br><br>        Plaintiff,<br><br>      v.<br><br>3M COMPANY; CHROMALLOY GAS TURBINE, LLC; CONTITECH USA, LLC; CORTEVA, INC.; DAIKIN AMERICA, INC., DUPONT DE NEMOURS, INC.; DURACELL MANUFACTURING LLC; E.I. DUPONT DE NEMOURS AND COMPANY; EIDP, INC.; FREUDENBERG-NOK GENERAL PARTNERSHIP; HENKEL US OPERATIONS CORPORATION; INTERFACE, INC.; INTERFACEFLOR, LLC; JFA LLC; KIMBERLY-CLARK CORPORATION; KLEEN-TEX INDUSTRIES, INC.; KLEEN-TEX USA, LLC; MILLIKEN & COMPANY; M+A MATTING, LLC; MOUNTVILLE MILLS, INC.; MOUNTVILLE MILLS INTERNATIONAL, LLC; MOUNTVILLE MILLS RUBBER COMPANY, LLC; MOUNTVILLE MILLS - THE MATWORKS, LLC; SPECIALTY FABRICS & CONVERTING, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; WASTE AWAY GROUP, INC.; WASTE MANAGEMENT, INC.; WEST POINT FOUNDRY AND MACHINE COMPANY; WESTPOINT HOME LLC; WESTROCK PACKAGING SYSTEMS, LLC; and FICTITIOUS DEFENDANTS A-Z,<br><br>        Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br><br>**NOTICE OF REMOVAL** |

1

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Circuit Court of Lee County, Alabama, to the United States District Court for the Middle District of Alabama, Eastern Division. 3M is entitled to remove this action based on federal officer jurisdiction. As grounds for removal, 3M states as follows.

## PRELIMINARY STATEMENT

1. Plaintiff the Water Works Board of the City of Opelika ("Plaintiff") seeks to hold 3M and certain other Defendants liable based on their alleged conduct in designing, manufacturing, or selling per- and polyfluoroalkyl substances ("PFAS") or PFAS-containing products, purportedly resulting in alleged contamination of Plaintiff's drinking water supply in the Chattahoochee River basin. The Complaint alleges that Plaintiff's water sources have been contaminated by PFAS discharges around and upriver from Plaintiff's water intakes that have emanated from industrial manufacturing facilities and landfills.

2. Plaintiff's own Complaint alleges that PFAS "migrate through surface water" and "travel long distances," but they do not identify all of the potential upstream sources of PFAS. Dobbins Air Reserve Base (Dobbins ARB) in Marietta, Georgia, has an extensive history of use and discharge, dating back to 1970, of PFAS-containing aqueous film-forming foams ("AFFF") that 3M and others developed and sold to the U.S. military in accordance with rigorous military

specifications ("MilSpec") issued by the Department of Defense ("DoD"). AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires.

3.      There is a surface water pathway by which confirmed PFAS from MilSpec AFFF use at Dobbins ARB plausibly has migrated to Plaintiff's water intakes. Given the allegations in Plaintiff's Complaint and the existence of a direct surface water connection between Dobbins ARB and Plaintiff's water intakes, the purported PFAS contamination of Plaintiff's water supply just as plausibly resulted (at least in part) from MilSpec AFFF use at Dobbins ARB as from the non-AFFF PFAS sources upriver from Plaintiff's water intakes that are alleged in the Complaint.

4.      Because the alleged PFAS contamination of Plaintiff's drinking water supply may have resulted (at least in part) from the use, storage, and/or disposal of MilSpec AFFF, 3M intends to assert in this action the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which bars Plaintiff from establishing, among other things, liability for the design and manufacture of MilSpec AFFF and for the provision of warnings for the product.

5.      Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action to have its federal defense adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government,

3

perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008). Courts have held that AFFF manufacturers properly removed cases to federal court on the ground that the plaintiffs' claims plausibly arose at least in part from MilSpec AFFF. *See, e.g., Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3-4 (W.D. Mich. Jan. 6, 2021); *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-2873, 2019 WL 2807266, at *2-3 (D.S.C. May 24, 2019) ("*In re AFFF*").

6.     Although Plaintiff's Complaint purports to disclaim any damages arising from contamination or injury related to AFFF, Plaintiff's requests for relief encompass damages plausibly attributable to PFAS-containing MilSpec AFFF. Some PFAS from MilSpec AFFF use plausibly has commingled with alleged PFAS from non-AFFF sources in the drinking water for which Plaintiff seeks to recover. Moreover, PFAS from MilSpec AFFF is identical to PFAS from other sources, and Plaintiff has not explained how to segregate out the PFAS covered by its disclaimer. "3M's Military AFFF production is inextricably related to [Plaintiff's] general allegations of PFAS contamination, notwithstanding [Plaintiff's] attempts to draw a line between 3M's federal and non-federal work." *Maryland v. 3M Co.*, 130 F.4th 380, 392 (4th Cir. 2025). 3M thus is entitled to a federal forum to litigate its federal defense.

4

## BACKGROUND

7.      Plaintiff filed this action on April 24, 2025, in the Circuit Court of Lee County, Alabama, bearing Case No. 43-CV-2025-900229.00. *See* Complaint (attached as Exhibit A).

8.      The Complaint alleges that Plaintiff provides drinking water to customers in and around Opelika, Alabama. *See* Complaint ¶ 30. The Complaint further alleges that Plaintiff owns two surface water treatment plants, the R.A. Betts Plant in Valley, Alabama, and the Saugahatchee Lake Plant in Opelika, Alabama. *Id.* Plaintiff allegedly owns and operates two surface water intakes for those plants that respectively draw water from Halawakee Creek/Lake Harding and Saugahatchee Lake. *Id.*; *see id.* ¶ 155. Those water sources are located in and are part of the Chattahoochee River basin. *Id.* ¶ 155.

9.      Plaintiff alleges that it brought this action to recover costs and obtain other relief relating to alleged contamination of its drinking water supply with PFAS. *See id.* ¶¶ 15-16. Plaintiff asserts that PFAS has been released into the Chattahoochee River basin; that Plaintiff must remove such PFAS from its drinking water supply; and that it must upgrade its water treatment plant to address PFAS. *See id.* ¶¶ 30-34, 151-166. Plaintiff seeks compensatory and punitive damages, specifically including costs of upgrading its water treatment facility and other expenses for PFAS removal. *See id.*, ¶¶ 33-34.

5

10. Plaintiff asserts that the PFAS for which it seeks to recover include perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), as well as chemicals that degrade to PFOA and PFOS and chemical precursors of PFOA and PFOS. *See id.* ¶¶ 1-2 & n.1. PFOA and PFOS are PFAS chemicals that have been used in manufacturing AFFF products, including MilSpec AFFF.

11. Plaintiff asserts claims against "Chemical Manufacturer Defendants" (including 3M and certain other Defendants that supplied PFAS and/or PFAS-containing products); "PFAS User Defendants" (including the owners and operators of manufacturing facilities that used and discharged PFAS and/or PFAS-containing products); and "Landfill Defendants" (including the owners and operators of waste facilities where PFAS waste was disposed and discharged). *See id.* ¶¶ 10-12, 35-87. Plaintiff generically alleges that Defendants have caused PFAS to enter Plaintiff's water sources. *Id.* ¶¶ 9, 14. The "PFAS User Defendants" that purchased and used PFAS supplied by 3M and other "Chemical Manufacturer Defendants" allegedly have discharged PFAS or PFAS-contaminated wastewater at locations in the Chattahoochee River basin upstream of Plaintiff's water intakes and have disposed of PFAS waste at landfills operated by the "Landfill Defendants." *See id.* ¶¶ 10-12, 152-154, 157-158. The Complaint identifies facilities upriver of Plaintiff's water intakes along the Chattahoochee River where the discharge of PFAS by "PFAS User Defendants" purportedly has contributed to the alleged contamination of Plaintiff's

6

water supply, including facilities that are located in LaGrange, Georgia, and in Hogansville, Georgia. *See, e.g., id.* ¶¶ 53-56, 59-61, 64-72, 74, 76, 153-154.

12.     Plaintiff alleges that it disclaims any damages from AFFF. *See id.* ¶¶ 1, 22, 24.

13.     Plaintiff asserts damages claims for negligence (*id.* ¶¶ 167-170), public nuisance (*id.* ¶¶ 171-175), private nuisance (*id.* ¶¶ 176-179); trespass (*id.* ¶¶ 180-186); and wantonness and punitive damages (*id.* ¶¶ 187-192).

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE MET

14.     Venue for the removal of this action is proper in this Court pursuant to 28 U.S.C. §§ 81(b)(3) and 1442(a) because the Circuit Court of Lee County, Alabama, is located within the Middle District of Alabama, Eastern Division.

15.     3M is not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Fed. Home Loan Mortg. Corp. v. Crittenden*, 2012 WL 3023264, at \*2 (M.D. Ala. June 14, 2012).

16.     Pursuant to 28 U.S.C. § 1446(a), 3M has attached as Exhibit A true and accurate copies of the Complaint, and 3M has collectively attached as Exhibit B true and accurate copies of all other documents on file in this case in the Circuit Court of Lee County, Alabama.

7

17.     3M was served with the Complaint and Summons on May 5, 2025. This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b).

18.     Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is filing a copy with the Clerk of the Circuit Court of Lee County, Alabama.

19.     By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

20.     3M reserves the right to amend or supplement this Notice of Removal.

21.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

### REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

22.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with

8

plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 133-35 (1989); *see also Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

23. Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construed" in favor of removal. *Watson v. Philip Morris Co., Inc.*, 51 U.S. 142, 147 (2007).

24. All requirements for removal under § 1442(a)(1) are satisfied when, as here, the notice of removal alleges that the plaintiff's injuries are, at least in part,

caused by or related to MilSpec AFFF, regardless of whether the plaintiff has purported to disclaim MilSpec AFFF-related injuries. *See Maryland*, 130 F.4th at 389-392 (rejecting plaintiffs' argument that their purported disclaimers precluded removal of PFAS lawsuit based on the theory that the alleged PFAS had derived in part from use of MilSpec AFFF); *Nessel*, 2021 WL 744683, at *3 (denying motion to remand in PFAS case because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"). Federal courts have found that removal under § 1442 is proper when the complaint seeks damages for alleged PFAS-related injuries from MilSpec AFFF. *See, e.g., In re AFFF*, 2019 WL 2807266, at *2-3 (D.S.C. May 24, 2019); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018).

25. Here, the alleged PFAS from non-AFFF sources plausibly has commingled in Plaintiff's water supply with some PFAS from MilSpec AFFF, and as a result, Plaintiff's claims for damages and other relief related to PFAS in its water supply relate to a single injury attributable at least in part to MilSpec AFFF. To the extent that alleged PFAS deriving from non-AFFF sources cannot actually be separated out from PFAS deriving from the MilSpec AFFF sources, Plaintiff necessarily is seeking to impose liability on 3M for alleged contamination

10

attributable in part to MilSpec AFFF, despite its alleged disclaimer. Moreover, 3M is entitled to a federal forum to litigate any apportionment of Plaintiff's damages between PFAS from non-AFFF sources and PFAS from AFFF sources, as Courts of Appeals have recently held in other cases for alleged PFAS contamination in which the plaintiffs similarly purported to disclaim injury from AFFF. *See Maryland*, 130 F.4th at 392 (holding that where "a factfinder must . . . decide the important causation and allocation questions," those questions "belong in federal court" ); *People ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024) (holding that "a federal court should be the one to resolve" difficult questions of apportionment of PFAS-related injuries between non-AFFF sources and AFFF sources subject to a federal defense, and ordering remand *only* because the plaintiff conceded that, pursuant to its alleged disclaimer, it would not seek recovery for "mixed PFAS contamination" so its "recovery is barred" "[i]f even a morsel of contamination" is from AFFF). This case has been properly removed to this Court based on federal officer jurisdiction.

## A. MilSpec AFFF

26. In the late 1960s/early 1970s, the U.S. military began using MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the U.S. Naval Research Laboratory developed AFFF (with some assistance from industry participants), and its researchers were

11

granted the first AFFF patent in 1966.[1] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[2]

27.     The design, manufacture, and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the DoD. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[3] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[4] Prior to such listing, "a manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[5] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a

---

[1] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[2] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[3] The 1969 MilSpec and all its revisions and amendments through the April 2020 amendment (MIL-PRF-24385F(4)) are available at https://tinyurl.com/yxwotjpg.

[4] MIL-PRF-24385F(4) § 3.1 (2020).

[5] DoD, SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

12

periodic basis to ensure continued integrity of the qualification status."[6] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[7]

28. From its inception until 2019, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants"—the class of PFAS chemicals that includes PFOA and PFOS.[8] Even today, the AFFF MilSpec expressly contemplates the presence of PFOA and PFOS in AFFF formulations (subject to limits imposed in 2017).[9] Indeed, the AFFF MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS from AFFF "while still meeting all other military specification requirements."[10]

29. 3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or

---

[6] DoD, SD-6, *supra* n.5, at 1.

[7] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[8] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[9] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[10] *See* MIL-PRF-24385F(4) § 6.6.

more of 3M's AFFF products were on the Navy's Qualified Products List for MilSpec AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[11] In addition to directly selling MilSpec AFFF to specific military bases, 3M was a major supplier of MilSpec AFFF to the Defense Logistics Agency, which distributed AFFF for use at military bases across the United States. Over time, the U.S. military used MilSpec AFFF produced by 3M throughout the United States, including in Alabama and in neighboring Georgia. At least some of the MilSpec AFFF used at Dobbins ARB was made by 3M.[12]

30.     The PFAS chemicals that allegedly are contaminating Plaintiff's drinking water supply plausibly have derived at least in part from the use, storage, and/or disposal of MilSpec AFFF at military facilities and elsewhere. Accordingly, Plaintiff's claims to recover for the alleged PFAS contamination of its water supply are related to or arise in part from MilSpec AFFF. Specifically, given the allegations in Plaintiff's Complaint, some PFAS from the use, storage, and/or disposal of 3M

---

[11] See MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at In re AFFF Prods. Liab. Litig., No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[12] 3M also historically manufactured and sold PFAS-containing MilSpec AFFF to non-military users. One notable example relates to so-called "Part 139" airports, i.e., certain large civilian airports. See 14 C.F.R. § 139.1 (2019). Part 139 airports historically have used MilSpec AFFF, including 3M's MilSpec AFFF products. In fact, by 2006, the U.S. government was requiring Part 139 airports to use AFFF meeting MilSpec standards. See FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006) (available at In re AFFF Prods. Liab. Litig., No. 2:18-mn-02873, ECF No. 1971-14 (D.S.C.)).

14

MilSpec AFFF at Dobbins ARB plausibly contributed to PFAS in the water sources in the Chattahoochee River basin where Plaintiff draws its drinking water supply.

31. Dobbins ARB is located in Marietta, Georgia, which is upriver along the Chattahoochee River from Plaintiff's water intakes. Dobbins ARB is co-located with Air Force Plant 6 and the Clay National Guard Center (formerly Naval Air Station Atlanta). Publicly available government studies show the extensive history of AFFF releases at Dobbins ARB dating back to 1970. *See* U.S. Army Corps of Engineers & Aerostar SES LLC, *Final Site Inspections Report of Fire Fighting Foam Usage at Dobbins Air Reserve Base, Cobb County, Georgia* (Oct. 2018), *available at* https://ar.cce.af.mil/Search (AR#214).[13] The studies confirm that for decades, AFFF was used and/or released at numerous sites at Dobbins ARB during firefighter training and firefighting incidents or as a result of cleaning, maintenance, and spills. Consistent with this documented history of extensive AFFF use, groundwater and surface water sampling at Dobbins ARB report significant concentrations of PFAS in Poorhouse Creek and a pond draining into Rottenwood Creek which flow directly into the nearby Chattahoochee River. Accordingly, there

---

[13] *See also* CTI-TPMC Environmental Services, LLC, *Final Uniform Federal Policy–Quality Assurance Project Plan Remedial Investigations of Per- and Polyfluoroalkyl Substances (PFAS), Air Force Plant 6, Marietta, Georgia* (Feb. 2024), *available at* https://ar.cce.af.mil/Search (AR #13242); AECOM, *FINAL Site Inspection Report, General Lucius D. Clay National Guard Ceter, Marietta, Georgia* (Apr. 2023), *available at* https://www.nationalguard.mil/Leadership/Joint-Staff/Personal-Staff/Public-Affairs/Community-Engagement/Environmental/PFAS-Library/Geor gia/FileId/341798/.

15

exists a direct surface water pathway by which some PFAS from AFFF releases at Dobbins ARB plausibly has migrated *via* the Chattahoochee River and its tributaries to the water sources from which Plaintiff draws its drinking water supply. The Chattahoochee River flows from the area around Dobbins ARB until it reaches Lake Harding, where one of Plaintiff's water intakes is located. The Chattahoochee River watershed in this stretch is relatively narrow, and no major rivers join the Chattahoochee River between Dobbins ARB and Lake Harding. Plaintiff's own Complaint alleges that PFAS "migrate through surface water" and "travel long distances" meaning that some PFAS from 3M MilSpec AFFF used at Dobbins ARB plausibly contribute to PFAS in Lake Harding. *See* Complaint ¶ 95.

32. PFAS from 3M MilSpec AFFF use at Dobbins ARB is at least as plausible a source of PFAS in Plaintiff's water supply as PFAS releases from the industrial facilities in LaGrange, Georgia, and in Hogansville, Georgia, which Plaintiff's Complaint identifies as sources of the alleged PFAS contamination. *See* Complaint ¶¶ ¶¶ 53-56, 59-61, 64-72, 74, 76, 153-154. The facilities in LaGrange and Hogansville are, just like Dobbins ARB, located near the Chattahoochee River at a distance upriver from Plaintiff's water intakes. Given the evidence of substantial release of PFAS from AFFF discharges at Dobbins ARB, elevated PFAS concentrations in surface water flowing from Dobbins ARB into the Chattahoochee River, and the direct flowpath between Dobbins ARB and Plaintiff's water intakes

16

*via* the Chattahoochee River, some PFAS from 3M MilSpec AFFF use at Dobbins ARB just as plausibly has contributed to PFAS in Plaintiff's water supply as PFAS from the industrial facilities identified by Plaintiff's own Complaint.

33. Once some of the PFAS from AFFF has migrated from Dobbins ARB and/or other MilSpec AFFF sites to surrounding groundwater and surface water, the PFAS would commingle with PFAS from any non-AFFF sources. Tellingly, Plaintiff's own Complaint alleges that PFAS "migrate through surface water and groundwater" and "travel long distances while causing extensive contamination." Complaint ¶ 95. Specific PFAS used in MilSpec AFFF are chemically indistinguishable from those same PFAS chemicals when they derive from non-AFFF sources. As some PFAS from MilSpec AFFF plausibly has migrated and commingled with PFAS from non-AFFF sources in Plaintiff's water supply *via* the Chattahoochee River, Plaintiff's effort to recover for *any* PFAS levels in its water supply provides a basis for 3M to assert its federal government contractor defense.

34. Because the alleged PFAS contamination at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use at military facilities and elsewhere that has inseparably commingled in the water supply with PFAS from non-AFFF sources, 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction. That is because Plaintiff's claims for alleged PFAS necessarily relate to PFAS deriving at least in part from MilSpec AFFF

17

sources, *i.e.*, "[i]t is entirely possible that Plaintiff['s] injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF." *Nessel*, 2021 WL 744683, at *3.

35.     Although the Complaint purports to allege that Plaintiff is not seeking any relief for PFAS contamination from AFFF (*see* Complaint ¶¶ 20-24), Plaintiff's claims nonetheless relate to alleged PFAS contamination that is, at least in part, plausibly caused by or related to MilSpec AFFF (and not just non-AFFF PFAS sources). Plaintiff's disclaimer does not preclude removal of this case. *See Maryland*, 130 F.4th at 389, 392 ("reject[ing] the notion that the States' purported disclaimers of 3M's federal conduct were dispositive" and "hold[ing] that 3M's Military AFFF production is inextricably related to the States' general allegations of PFAS contamination, notwithstanding their attempts to draw a line between 3M's federal and non-federal work"); *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 180 (1st Cir. 2024) (holding that defendant properly removed case under the federal officer removal statute, notwithstanding the plaintiff's alleged disclaimer of relief related to federal conduct, because "[t]o credit the disclaimer would permit [plaintiff] to recover based on what, when considered through [defendant's] theory of removal, were acts under a federal officer," and plaintiff's "attempts at artful pleading cannot serve as an end run around the federal officer removal statute"). Federal officer removal is proper despite the alleged disclaimer because the claimed

18

injury from PFAS is plausibly due in part to PFAS from MilSpec AFFF—and at a minimum, 3M is entitled to litigate any apportionment of Plaintiff's injury between PFAS from MilSpec AFFF sources and PFAS from other sources in federal court. *See Maryland*, 130 F.4th at 392 (holding that where "a factfinder must . . . decide the important causation and allocation questions," those questions "belong in federal court"); *Raoul*, 111 F.4th at 849 ("If the contamination came from AFFF, then the government contractor defense could apply . . . even though the State's complaint expressly excluded 3M from liability for PFAS contamination sources from AFFF" because "a factfinder would need to apportion the contamination" between AFFF and non-AFFF PFAS sources); *Nessel*, 2021 WL 744683, at *3 (denying State of Michigan's motion to remand and concluding that federal officer removal was proper notwithstanding the complaint's allegation that Michigan was not seeking relief for MilSpec AFFF; "Plaintiffs' artful pleading does not obviate the facts on the ground.").

### B. All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied

#### 1. The "Person" Requirement Is Satisfied

36. The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes

19

corporations. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135-36.

### 2. The "Acting Under" Requirement Is Satisfied

37. The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 152; *Papp*, 842 F.3d at 812. The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255.

38. The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9

20

(describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)). The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[14] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF.

39.     In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[15]

40.     For these reasons, 3M has satisfied the "acting under" requirement. *See In re AFFF*, 2019 WL 2807266, at *2 (finding that "acting under" requirement was satisfied because defendant demonstrated that it manufactured MilSpec AFFF under guidance of U.S. military); *Nessel*, 2021 WL 744683, at *3 (holding that AFFF

---

[14] Fulfilling the Roosevelts' Vision at 37.

[15] *See* DoD, SD-6, *supra* n.5, at 1.

21

manufacturers were "acting under" a federal officer in connection with manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at \*8-9 (same).

### 3. The "Under Color Of Federal Office" Requirement Is Satisfied

41. The third requirement, that the defendant's actions were taken "under color of federal office," requires a "nexus" between plaintiff's claims and the defendant's acts undertaken at the direction of a federal officer. As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted) (explaining that 28 U.S.C. § 1442 permits removal of actions "for *or relating to* any act under color of [federal] office"); *Papp*, 842 F.3d at 813; *Isaacson*, 517 F.3d at 137-38 (explaining that it is sufficient if the act that allegedly caused the plaintiff's injuries occurred while the defendant was performing its official duties).[16]

42. Here, Plaintiff's claims against 3M for alleged PFAS contamination of its water and wastewater are for or relate to (at least in part) 3M's design, manufacture, and sale of MilSpec AFFF. MilSpec AFFF was designed and

---

[16] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at \*5.

manufactured according to DoD military specifications; has been used, stored, and/or released at military facilities and elsewhere in the vicinity of Plaintiff's water supply; and has plausibly impacted PFAS levels of Plaintiff's water supply. As a result, Plaintiff's claims against 3M relate to its acts taken under color of federal office. *See In re AFFF*, 2019 WL 2807266, at *3 (nexus element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the U.S. military imposes MilSpec standards."); *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government.").

43. Courts "credit Defendants' theory of the case" when determining whether the requisite nexus exists. *Isaacson*, 517 F.3d at 137; *see Maryland*, 130 F.4th at 389; *Express Scripts, Inc.*, 119 F.4th at 192; *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"). As averred in this Notice of Removal, Plaintiff's alleged injuries plausibly arise at least in part from MilSpec AFFF. Plaintiff's claims thus sufficiently relate to 3M's actions under color of federal office. "[I]t is enough for . . . removal that at least some of the pollution arose from the federal acts." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020)).

23

#### 4.    The "Colorable Federal Defense" Requirement Is Satisfied

44.    The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

45.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770,

24

783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

46. Under the government contractor defense, the defendant is not liable for the design or manufacture of equipment or supplies (or for warnings relating to them) "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

47. The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[17] Those

---

[17] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 3, *supra*.

25

specifications are "reasonably precise," including in requiring the use of PFAS.[18] In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See In re AFFF*, 2019 WL 2807266, at *3 (noting that a colorable defense was alleged where AFFF MilSpec "included specifications for the chemical class that includes PFOS/PFOA"); *Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

48.     With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[19] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See In re AFFF*, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); *Ayo*, 2018 WL 4781145, at *13 ("There

---

[18] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that allow AFFF to meet the performance requirements of the specification.

[19] *See* QPL/QPD Histories, *supra* n.11.

26

is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications.").

49.     Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[20] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[21] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil

---

[20] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[21] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

27

contamination" and the "potential" for "groundwater contamination."[22] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[23] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.[24] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, the DoD still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[25] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[26] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[27] *See In re AFFF*, 2019 WL 2807266, at *3 ("As to whether

---

[22] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[23] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

[24] *See* EPA, Revised Draft Hazard Assessment, *supra* n.20.

[25] DoD, *Aqueous Film Forming Foam Report to Congress* 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[26] MIL-PRF-24385F(4) § 3.2 (2020).

[27] MIL-PRF-24385F(4) § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

28

[defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . ."); *Ayo*, 2018 WL 4781145, at \*12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

50. At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at \*13.

51. In the MDL, the court has found based on an extensive factual record that the government contractor defense asserted by 3M presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, 2022 WL

29

4291357, at \*12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is, by definition, better than merely "colorable."

52. 3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to Plaintiff that were caused in whole or in part by 3M's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

53. Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the Circuit Court of Lee County, Alabama, to the United States District Court for the Middle District of Alabama, Eastern Division.

DATED: June 4, 2025

/s/ W. Larkin Radney, IV
One of the Attorneys for
Defendant 3M Company

OF COUNSEL:

M. Christian King
Harlan I. Prater, IV
W. Larkin Radney, IV
William H. Morrow
Benjamin P. Harmon
Jacob M. Salow
Will Johnson
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, AL 35203-3200
(205) 581-0700
cking@lightfootlaw.com
hprater@lightfootlaw.com
lradney@lightfootlaw.com
wmorrow@lightfootlaw.com
bharmon@lightfootlaw.com
jsalow@lightfootlaw.com
wjohnson@lightfootlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send electronic notice of such filing to all counsel of record, and that a copy was served via U.S. Mail to the following:

Matt Conn
Lee Patterson
Madison Gitschier
Ethan Wright
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
mconn@friedman-lawyers.com
lpatterson@ friedman-lawyers.com
mgitschier@friedman-lawyers.com
ewright@friedman-lawyers.com

CHROMALLOY GAS TURBINE LLC
c/o Corporation Service Company
4100 RCA Boulevard, Suite 100
Palm Gardens, FL 33410

CONTITECH USA, LLC
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

CORTEVA, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

32

DAIKIN AMERICA, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

DUPONT DE NEMOURS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DURACELL MANUFACTURING, LLC
c/o CT Corporation System
289 S Culver Street
Lawrenceville, GA, 30046

E.I. DUPONT DE NEMOURS AND COMPANY
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

EIDP, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

FREUDENBERG-NOK GENERAL PARTNERSHIP
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

HENKEL US OPERATIONS CORPORATION
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

INTERFACE, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

33

INTERFACEFLOR, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

JFA LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

KIMBERLY-CLARK CORPORATION
c/o CT Corporation System
289 S Culver Street
Lawrenceville, GA 30046

KLEEN-TEX INDUSTRIES, INC.
c/o Bruce Howard
210 Lukken Industrial Drive East
Lagrange, GA 30241

KLEEN-TEX USA, LLC
c/o Bruce Howard
210 Lukken Industrial Drive East
Lagrange, GA 30241

MILLIKEN & COMPANY
c/o CT Corporation System
289 S Culver Street
Lawrenceville, GA 30046

M+A MATTING, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

MOUNTVILLE MILLS, INC.
c/o Jonathan Brock Morman
201 Ridley Avenue, Suite B
LaGrange, GA 30240

34

MOUNTVILLE MILLS INTERNATIONAL, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

MOUNTVILLE MILLS RUBBER COMPANY, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

MOUNTVILLE MILLS - THE MATWORKS, LLC
c/o Jonathan Brock Morman
1729 South Davis Road
Lagrange, GA 30241

SPECIALTY FABRICS & CONVERTING, INC.
c/o Continental
Attention General Counsel
1830 MacMillan Park Drive
Fort Mill, SC, 29707

THE CHEMOURS COMPANY
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

THE CHEMOURS COMPANY FC, LLC
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

WASTE AWAY GROUP, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

35

WASTE MANAGEMENT, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

WEST POINT FOUNDRY AND MACHINE COMPANY
c/o William Huguley IV
2021 State Line Road
West Point, GA, 31833

WESTPOINT HOME, LLC
c/o Paracorp Incorporated
2 North Jackson Street Suite 605
Montgomery, AL 36104

WESTROCK PACKAGING SYSTEMS, LLC
c/o Corporation Service Company Inc.
641 South Lawrence Street
Montgomery, AL 36104

*Defendants*

/s/ W. Larkin Radney, IV
One of the Attorneys for
Defendant 3M Company